**EXHIBIT A**

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

ENDORSED
First Judicial District Court

JUN 2 9 2011

Santa Fe, Rio Arriba &
Los Alamos Counties
PO Box 2268
Santa Fe, NM 87504-2268

JASON SPRADLIN, AS PERSONAL
REPRESENTATIVE OF THE WRONGFUL
DEATH ESTATE OF DOUGLAS A. SPRADLIN, JR.,
DECEASED,

                Plaintiff,

vs.

                        NO. D0101-CV-201-2107

THI OF NEW MEXICO AT HOBBS CENTER,
L.L.C., THI OF NEW MEXICO, L.L.C.,
THI OF BALTIMORE, INC., FUNDAMENTAL
LONG TERM CARE HOLDINGS, L.L.C.,
TRANS HEALTHCARE, INC.,
MURRAY FORMAN, LEONARD GRUNSTEIN,
ERIC MCLEMORE, DAVID STROUD,
AND DOES 1-250,

                Defendants,

## COMPLAINT FOR WRONGFUL DEATH, NEGLIGENCE, NEGLIGENCE PER SE, MISREPRESENTATION, VIOLATION OF THE UNFAIR TRADE PRACTICES ACT AND PUNITIVE DAMAGES

      COMES NOW, Jason Spradlin, as Personal Representative for the Wrongful Death Beneficiaries of Douglas A. Spradlin, Jr., deceased, by and through his attorneys, Wilkes & McHugh, P.A. and for the causes of action against Defendants, and each of them, states and alleges as follows:

### PARTIES

1.     Douglas A. Spradlin, Jr. was a resident at the nursing home known as Hobbs Healthcare Center located in Lea County at 5715 Lovington Highway, Hobbs, New Mexico 88240 from on our about August 31, 2006 to March 6, 2009, just five days before his death.

1

2.     Jason Spradlin brings this suit in his capacity as a personal representative of the wrongful death beneficiaries of his father, Douglas A. Spradlin, Jr., deceased.

3.     Jason Spradlin was appointed personal representative by the Fifth Judicial District Court on October 21, 2010, and files herewith a copy of the Order for Appointment of Personal Representative to Pursue Wrongful Death Claim, attached as Exhibit 1.

4.     At all relevant times, Defendants THI OF NEW MEXICO AT HOBBS CENTER, L.L.C. a Delaware limited liability company, and JOHN DOES 1 through 50 were licensed and doing business as (dba) HOBBS HEALTHCARE CENTER in Hobbs, New Mexico, Lea County (hereinafter the "NURSING HOME").

5.     At all relevant times, Defendants THI OF NEW MEXICO, L.L.C., THI OF BALTIMORE, INC., FUNDAMENTAL LONG TERM CARE HOLDINGS, L.L.C., TRANS HEALTHCARE, INC., MURRAY FORMAN, LEONARD GRUNSTEIN and JOHN DOES 50 through 100 (hereinafter collectively referred to as "NURSING HOME MANAGEMENT DEFENDANTS") owned, operated, and/or managed the NURSING HOME, and furthermore participated in, authorized, and/or directed the conduct of the NURSING HOME and its respective agents and employees.

6.     At all relevant times, the NURSING HOME was in the business of providing long-term care as a 24-hour nursing facility and as such was subject to the requirements of all corresponding statutes and regulations that govern the operation of a 24-hour nursing facility. (Hereinafter all references to the "DEFENDANTS" are in reference to the NURSING HOME, NURSING HOME MANAGEMENT DEFENDANTS, ERIC MCLEMORE, DAVID STROUD and JOHN DOES 1 through 250.)

7.     JOHN DOES 121 through 250 are those persons and/or entities whose conduct caused the injuries alleged herein to Douglas A. Spradlin, Jr.

8.     JOHN DOES 1 through 250 are persons and/or entities whose relationships to the named Defendants, or whose acts or omissions, give rise to legal responsibility for the

damages incurred by Douglas A. Spradlin, Jr., but whose true identities, at the present time, are unknown to Plaintiff. These persons are hereby notified of Plaintiff's intention to join them as defendants, if and when, additional investigation or discovery reveals the appropriateness of such joinder.

9.     THI of New Mexico at Hobbs Center, L.L.C., is a Delaware limited liability company engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including the NURSING HOME, at all times material to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by said Defendant in the ownership, operation, management and/or control of the NURSING HOME. Defendant THI of New Mexico at Hobbs Center, L.L.C may be served with process by serving its registered agent National Corporation Research, LTD., 1012 Marquez Place, Suite 106B, Santa Fe, New Mexico, 87505.

10.     THI OF NEW MEXICO, L.L.C., is a Delaware limited liability company engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including the NURSING HOME, at all times material to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by said Defendant in the ownership, operation, management and/or control of the NURSING HOME. Defendant THI OF NEW MEXICO, L.L.C., may be served with process by serving its registered agent National Corporation Research, LTD., 1012 Marquez Place, Suite 106B, Santa Fe, New Mexico, 87505.

11.     THI of Baltimore, Inc. is a Delaware corporation engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including the NURSING HOME, at all times material to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by said Defendant in the ownership, operation, management and/or control of the NURSING HOME. Defendant THI of Baltimore, Inc. may be served with process by serving its

3

registered agent National Corporation Research, LTD., 836 Park Avenue, Second Floor, Baltimore, MD, 21201.

12.     Fundamental Long Term Care Holdings, L.L.C. is a Delaware limited liability company engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including the NURSING HOME, at all times material to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by said Defendant in the ownership, operation, management and/or control of the NURSING HOME. Defendant Fundamental Long Term Care Holdings, L.L.C. may be served with process by serving its registered agent National Corporate Research, 520 South 2nd Street, #403, Springfield, IL, 62701.

13.     Trans Healthcare, Inc. is a Delaware corporation engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including the NURSING HOME, at all times material to this lawsuit.   The causes of action made the basis of this suit arise out of such business conducted by said Defendant in the ownership, operation, management and/or control of the NURSING HOME.   Defendant Trans Healthcare, Inc may be served with process by serving its registered agent National Corporation Research, LTD., 836 Park Avenue, Second Floor, Baltimore, MD, 21201.

14.     Murray Forman is engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including the NURSING HOME, at all times material to this lawsuit.   The causes of action made the basis of this suit arise out of such business conducted by said Defendant in the ownership, operation, management and/or control of the NURSING HOME. Defendant Murray Forman may be served with process by serving him at his place of business at 405 Lexington Avenue, 10th floor, New York, New York, 10174.

15.     Leonard Grunstein is engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including the NURSING HOME, at all times material to this lawsuit.   The causes of action made the

4

basis of this suit arise out of such business conducted by said Defendant in the ownership, operation, management and/or control of the NURSING HOME. Defendant Leonard Grunstein may be served with process by serving him at his place of business at 405 Lexington Avenue, 10th floor, New York, New York, 10174.

16.     Defendants Eric McLemore, David Stroud and John Does 111 through 120 were licensed as Nursing Home Administrators in the State of New Mexico.  During all relevant times they were employed as the Administrators of the NURSING HOME.

## DIRECT AND VICARIOUS LIABILITY

17.     At all relevant times, the NURSING HOME and the NURSING HOME MANAGEMENT DEFENDANTS owned, operated, and/or managed the NURSING HOME, and furthermore participated in, authorized, and/or directed the conduct of the NURSING HOME and its respective agents and employees. As such, the NURSING HOME and the DEFENDANTS are directly liable for their own negligence, recklessness and other tortious conduct, in the hiring and management of their agents and employees, as is more fully alleged herein.

18.     At all relevant times, the NURSING HOME and the NURSING HOME MANAGEMENT DEFENDANTS provided management services to the NURSING HOME, which governed and controlled the nursing care and custodial services provided to Douglas A. Spradlin, Jr., and that by virtue of their management and control over the NURSING HOME, the NURSING HOME and the NURSING HOME MANAGEMENT DEFENDANTS voluntarily and intentionally assumed responsibility for and provided supervisory services for the nursing care and custodial services provided to Douglas A. Spradlin, Jr. while he was a resident at the NURSING HOME.

19.     That the NURSING HOME and the NURSING HOME MANAGEMENT DEFENDANTS through their managers, directors, presidents, vice-presidents, executive officers, and other agents, directly oversaw, managed, and/or controlled all aspects of the operation and management of the NURSING HOME, including, but not limited to, the budget of the NURSING HOME, the staffing of the NURSING HOME, staff training,

the NURSING HOME'S policy and procedures manual(s), the licensing of the NURSING HOME, accounts payable, accounts receivable, NURSING HOME development and leasing, general accounting, cash management, pricing, reimbursement, capitalization, and profit and loss margins.

20.     That the NURSING HOME and the NURSING HOME MANAGEMENT DEFENDANTS, through their managers, directors, presidents, vice-presidents, executive officers, and other agents created budgets, policies and procedures that the NURSING HOME employees were required to implement and follow.

21.     That the NURSING HOME and the NURSING HOME MANAGEMENT DEFENDANTS employed all of those persons who attended to and provided care to Douglas A. Spradlin, Jr. while he was a resident at the NURSING HOME, and employed those persons in management and supervisory positions who directed the operations of the NURSING HOME, all of whom were acting within the course and scope of their employment, during Douglas A. Spradlin, Jr.'s residency.

22.     That the NURSING HOME and the NURSING HOME MANAGEMENT DEFENDANTS, through their administrators, directors and managing agents, complied with and ratified all conduct of the NURSING HOME alleged herein.

23.     That at all relevant times, the DEFENDANTS were the knowing agents and/or alter-egos of one another, inclusive, and that the DEFENDANTS' officers, directors, and managing agents, directed, approved, and/or ratified the conduct of each of the other DEFENDANTS' officers, agents and employees, and are therefore vicariously liable for the acts and/or omissions of their co-defendants, their agents and employees, as is more fully herein alleged.  Moreover, at all relevant times, all DEFENDANTS were acting within the course and scope of their employment.

24.     The DEFENDANTS' tortious acts and omissions, as alleged herein, were done in concert with each other and pursuant to a common design and agreement to accomplish a particular result, namely maximizing profits by operating the NURSING HOME in such a manner that the NURSING HOME was underfunded and understaffed.  Moreover, the

NURSING HOME aided and abetted each other in accomplishing the acts and omissions alleged herein. (*See* Restatement (Second) of Torts § 876 (1979)).

25.     The DEFENDANTS, by their acts and omissions as alleged herein, operated pursuant to an agreement, with a common purpose and community of interest, with an equal right of control, and subject to participation in profits and losses, as further alleged herein, such that they operated a joint enterprise or joint venture, subjecting each of them to liability for the acts and omissions of each other.

### VENUE/JURISDICTION

26.     Venue and jurisdiction are appropriate in Santa Fe County, New Mexico pursuant to NMSA §38-3-1.

### FACTUAL SUMMARY/PLAINTIFF'S INJURIES

27.     On approximately August 31, 2006, Douglas A. Spradlin, Jr. was admitted as a resident to the NURSING HOME and placed under the care of the DEFENDANTS and their employees. He remained a resident at the NURSING HOME until March 6, 2009.

28.     During his residency at the NURSING HOME, Defendants knew that Douglas A. Spradlin, Jr. was in a compromised state because he suffered from dementia and chronic obstructive pulmonary disease.

29.     As a result of Douglas A. Spradlin, Jr.'s condition, he required supervision, close monitoring, and medical attention to ensure his health, safety and well-being.

30.     Defendants knew that by virtue of his physical and mental state, Douglas A. Spradlin, Jr. was dependent upon them for nursing and other health care services.

31.     Defendants also knew that by virtue of Douglas A. Spradlin, Jr.'s physical and mental state that he was dependent upon them for his activities of daily living including, but not limited to, feeding and dietary planning, skin care, hygiene, infection control/prevention, toileting, and physical rehabilitation/exercise. Furthermore, Defendants knew that Mr. Spradlin was susceptible to infections and was at risk for developing pressure sores because of his limited mobility.

32.     Despite Defendants' knowledge and awareness of Douglas A. Spradlin, Jr.'s

needs, during his residency at the NURSING HOME, Douglas A. Spradlin, Jr. did not receive the attention and care necessary to prevent the development and worsening of pressure sores and to prevent him from developing infections.

33.     Mr. Spradlin in fact developed pressure sores as a result of the Defendants' inattention and lack of necessary care to prevent the development of pressure sores.

34.     Despite Defendants' knowledge of Mr. Spradlin's risk for skin breakdown, they nevertheless failed to properly assess, monitor and prevent the development of his pressure ulcers.

35.     As a result of Defendants' inattention and lack of necessary care, Mr. Spradlin in fact developed infections and resulting injuries.

36.     Douglas A. Spradlin, Jr. needed assistance with eating and dietary planning, which was known to Defendants. Defendants' failure to provide this assistance put Mr. Spradlin at risk for malnutrition, weight loss and dehydration, which was known to the Defendants and which he in fact suffered.

37.     During his residency, the DEFENDANTS knew that Douglas A. Spradlin, Jr. was prone to falls and vulnerable to injuries. In fact, DEFENDANTS or their employees had assessed Mr. Spradlin as being at high risk for falls as a result of his cognitive impairment and unsteady gait.

38.     Despite the DEFENDANTS' knowledge and awareness of Douglas A. Spradlin, Jr. needs, Douglas A. Spradlin, Jr. did not receive the attention and care necessary to prevent him from falling at the NURSING HOME on multiple occasions and suffering injuries, including, but not limited to, a right hip fracture.

39.     Douglas A. Spradlin, Jr.'s injuries were entirely preventable had Defendants simply provided their respective facilities with sufficient staff, in number and training, to provide him with the amount of care that laws and regulations required.

40.     Douglas A. Spradlin, Jr.'s injuries, including death, would not have occurred but for the complete willful disregard by Defendants of their duties owed to Douglas A. Spradlin, Jr.

41.     Douglas A. Spradlin, Jr. was subjected to pain and suffering and he eventually died as a result of the inadequate care and treatment he suffered at the hands of the Defendants.

## CAUSES OF ACTION

### COUNT 1
### WRONGFUL DEATH AGAINST THE DEFENDANTS

42.     All allegations set forth above in paragraphs 1 through 41 are incorporated by reference as if fully set forth herein.

43.     The acts and omissions of the DEFENDANTS, and each of them, individually and through their agents and employees, were wrongful and negligent and were the proximate cause of Douglas A. Spradlin, Jr.'s death.

44.     Plaintiffs are entitled to recover all damages legally available under the New Mexico Wrongful Death Act, NMSA § 41-2-1, including the loss of enjoyment of life, the monetary worth of his extreme pain and extreme suffering, the reasonable expenses of necessary medical care and treatment and of funeral and burial, together with all other damages that are fair and just.

45.     The actions of the DEFENDANTS, individually and through their agents or employees, were malicious, willful, reckless, and/or done with wanton disregard for Mr. Spradlin, giving rise to punitive damages against these Defendants.

### COUNT II
### NEGLIGENCE AGAINST ALL DEFENDANTS

46.     All allegations set forth above in paragraphs 1 through 45 are incorporated by reference as if fully set forth herein.

47.     Defendants owed a duty to their residents, including Mr. Spradlin, to provide care treatment, and services within accepted standards of care.

48.     Defendants owed a duty to their residents, including Mr. Spradlin, to hire, train and supervise employees to deliver care and services to residents in a sage and beneficial manner.

49.     Defendants breached the duty owed their residents, including Mr. Spradlin, and were negligent in their care and treatment of Mr. Spradlin, through their acts or omissions, which include, but are not limited to, the following:

a.   Failure to adequately assess, evaluate and supervise nursing personnel so as to ensure that Mr. Spradlin received appropriate nursing care, in accordance with Defendants' policies and procedures, state and federal laws and regulations;

b.   Failure to provide Mr. Spradlin with basic and necessary care and supervision;

c.   Failure to protect Mr. Spradlin from abuse and neglect;

d.   Failure to treat Mr. Spradlin with kindness and respect.

e.   Failure to properly notify Mr. Spradlin's family and/or physician of significant changes in his health status;

f.   Making false, misleading and deceptive representations as to the quality of care, treatment, and services provided by Defendants to their residents, including Mr. Spradlin;

g.   The failure to adopt adequate guidelines, policies, and procedures for documenting, maintaining files, investigating, and responding to any complaint regarding the quantity of resident care, the quality of patient or resident care, or misconduct by all Defendants' employees, irrespective of whether such complaint derived from a state or federal survey agency, a resident of said facilities, an employee of said facilities or any interested person;

h.   Failure of high managerial agents and corporate officers to adequately hire, train, supervise, and retain the administrator and director of nurses so as to assure that Mr. Spradlin received care in accordance with the Defendants' policies and procedures, state and federal laws and regulations;

i.   Failure to adequately hire, train, supervise and retain a sufficient amount of competent and qualified registered nurses, licensed vocational nurses, nurses assistants and other personnel in their respective facilities to assure that Mr. Spradlin received care, treatment, and services in accordance with Defendants' policies and procedures, state and federal law and regulations;

j.  The failure to increase the number of nursing staff at their respective facilities to ensure that Mr. Spradlin:

    i.   received timely and accurate care assessments;
    ii.  received prescribed treatment, medication, and diet;
    iii. received necessary supervision; and
    iv.  received timely nursing and medical intervention due to a significant change in condition.

k.  The failure to provide nursing personnel sufficient in number to provide proper treatment and assessment to Mr. Spradlin and other residents, to protect Mr. Spradlin's skin integrity and to prevent pressure sores and the infection of pressure sores.

l.  The failure to provide nursing staff sufficient in number to ensure that Mr. Spradlin attained and maintained his highest level of physical, mental and psychosocial well being;

m.  The failure to provide adequate supervision to the nursing staff so as to ensure that Mr. Spradlin received adequate and proper nutrition, therapeutic diet, sanitary care treatments, skin care and sufficient nursing observation and examination of the responses, symptoms, and progress in the physical condition of Mr. Spradlin.

n.  The failure to maintain medical records on Mr. Spradlin in accordance with accepted professional standards and practices that are complete, accurately documented, readily accessible and systematically organized with respect to:

    i.   The diagnosis of Mr. Spradlin
    ii.  The treatment of Mr. Spradlin
    iii. The assessment and establishment of appropriate care plans of care and treatment for Mr. Spradlin;

o.  The failure by the members of the governing body of the NURSING HOME to discharge its legal and lawful obligation by:

    i.   Ensuring that the rules and regulations designed to protect the health and safety of the residents, such as Mr. Spradlin, as promulgated in the New Mexico Nursing Home Residents Rights Act 7.9.2.22 NMAC (2005), by the New Mexico Health Facility Licensing and Certification Bureau, state and federal laws and regulations, were consistently complied with on an ongoing basis;
    ii.  Ensuring that the resident care policy for the NURSING HOME were consistently complied with on an ongoing basis, and;
    iii. Responsibly ensuring that appropriate corrective measures were

implemented to correct problems concerning inadequate resident care;

p.  The failure to take reasonable steps to prevent, eliminate and correct the deficiencies and problems in resident care.

50.  Mr. Spradlin's care was under the exclusive control and management of Defendants.

51.  Mr. Spradlin's injuries were of a kind which does not ordinarily occur in the absence of negligence on Defendants' part.

52.  The injuries and wrongful death of Mr. Spradlin are a proximate result of the acts or omissions set forth above, singularly or in combination.

## COUNT III
## NEGLIGENCE PER SE AGAINST THE DEFENDANTS

53.  All allegations set forth above in paragraphs 1 through 52 are incorporated by reference as if fully set forth herein.

54.  At all relevant times, the DEFENDANTS were engaged in the business of operating a long-term health care facility in Hobbs, New Mexico, and were subject to state and federal laws and regulations regarding long-term care facilities and nursing homes.

55.  In its treatment of Mr. Spradlin, the DEFENDANTS violated state and federal laws and regulations, which set forth not the ordinary standard of care, but the minimum standards, including, but not limited to, the following, which required DEFENDANTS to:

a.  "care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident" 42 USC § 1395i-3(b)(1)(A) and 42 USC § 1396r-(b)(1)(A);

b.  "provide services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, in accordance with a written plan of care" 42 USC § 1395i-3(b)(2) and 42 USC §1396r-(b)(2);

c.      "conduct a comprehensive, accurate, standardized, reproducible assessment of each resident's functional capacity" " 42 USC § 1395i-3(b)(3) and 42 USC §1396r-(b)(3);

d.      provide "nursing services and specialized rehabilitative services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident" 42 USC § 1395i-3(b)(4)(A)(i) and 42 USC §1396r-(b)(4)(A)(i);

e.      provide "medically-related social services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident" 42 USC § 1395i-3(b)(4)(A)(ii) and 42 USC §1396r-(b)(4)(A)(ii);

f.      provide "pharmaceutical services (including procedures that assure the accurate acquiring, receiving, dispensing, and administering of all drugs and biologicals) to meet the needs of each resident" 42 USC § 1395i-3(b)(4)(A)(iii) and 42 USC §1396r-(b)(4)(A)(iii);

g.      provide "dietary services that assure that the meals meet the daily nutritional and special dietary needs of each resident" 42 USC § 1395i-3(b)(4)(A)(iv) and 42 USC §1396r-(b)(4)(A)(iv);

h.      provide "an on-going program, directed by a qualified professional, of activities designed to meet the interests and the physical, mental, and psychosocial well-being of each resident" 42 USC § 1395i-3(b)(4)(A)(v) and 42 USC §1396r-(b)(4)(A)(v);

i.      provide "24-hour licensed nursing service...sufficient to meet nursing needs of its residents" 42 USC § 1395i-3(b)(4)(C)(i) and 42 USC §1396r-(b)(4)(C)(i)(I);

j.      protect and promote the rights of each resident" 42 USC § 1395i-3(c)(1)(A) and 42 USC §1396r-(c)(1)(A);

k.      "right to voice grievances with respect to treatment or care that is (or fails to be) furnished, without discrimination or reprisal for voicing the grievances and the right to prompt efforts by the facility to resolve grievances the resident may have" 42 USC § 1395i-3(c)(1)(A)(vi) and 42 USC §1396r-(c)(1)(A)(vi);

l.      "establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment in which residents reside and to help prevent the development and transmission of disease and infection" 42 USC § 1395i-3(d)(3)(A) and 42 USC §1396r-(d)(3)(A);

m.   "operate and provide services in compliance with all applicable Federal, State and local laws and regulations…and with accepted professional standards and principles which apply to professionals providing services in such a facility" 42 USC § 1395i-3(d)(4)(A) and 42 USC §1396r-(d)(4)(A);

n.   not abuse or allow abuse or harm to come to its residents, pursuant to NMSA 1978 §30-47-4, which criminalizes conduct constituting "abuse" of a resident in a care facility. "Abuse" is "any act or failure to act performed intentionally, knowingly, or recklessly that causes or is likely to cause harm to a resident, including…medically inappropriate conduct that causes or is likely to cause physical harm to a resident." NMSA 1978 §30-47-3(A) (4).

o.   Not to neglect its residents pursuant to NMSA 1978 §30-47-5, which criminalizes conduct constituting "neglect" of a resident in a care facility. "Neglect includes any grossly negligent:

   i.   "failure to provide any treatment, service, care, medication or items that is necessary to maintain the health or safety of a resident," NMSA 1978 §30-47-3(F)(1);

   ii.   "failure to take any reasonable precaution that is necessary to prevent damage to the health or safety of a resident," NMSA 1978 §30-47-3(F)(2);

   iii.   "failure to carry out a duty to supervise properly or control the provision of any treatment, care, good, service or medication necessary to maintain the health or safety of a resident," NMSA 1978 §30-47-3(F)(3);

p.   allow residents to be "free of interference, coercion, discrimination, and reprisal from the facility in exercising his or her rights" 42 CFR §483.10(a)(2);

q.   immediately consult with the resident's physician and notify the resident's legal representative or an interested family member when there was:

   i.   "an accident involving the resident which results in injury and has the potential for requiring physician intervention," 42 CFR §483.10(b)(11)(i)(A);

   ii.   "a significant change in the resident's physical, mental, or psychosocial status," 42 CFR §483.10(b)(11)(i)(B);

r.      allow resident to "voice grievances without discrimination or reprisal. Such grievances include those with respect to treatment which has been furnished as well as that which has not been furnished; and prompt efforts by the facility to resolve grievances the resident may have" 42 CFR §483.10(f)(1);

s.      allow resident "to be free from verbal, sexual, physical, and mental abuse" 42 CFR §483.13(b);

t.      "ensure that all alleged violations involving mistreatment, neglect, or abuse, including injuries of unknown source....are reported immediately to ...officials in accordance with state law" 42 CFR §483.13(c)(2);

u.      "have evidence that all alleged violations are thoroughly investigated, and must prevent further potential abuse" 42 CFR §483.13(c)(3);

v.      "care for its residents in a manner and in an environment that promotes maintenance or enhancement of each resident's quality of life" 42 CFR §483.15;

w.      "promote care for residents in a manner and in an environment that maintains or enhances each resident's dignity and respect" 42 CFR §483.15 (a);

x.      "must conduct initially and periodically a comprehensive, accurate, standardized, reproducible assessment of each resident's functional capacity" 42 CFR §483.20 (a);

y.      "provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care" 42 CFR §483.25

z.      ensure that "a resident's abilities in activities of daily life do not diminish unless circumstances of the individual's clinical condition demonstrate that diminution was unavoidable. 42 CFR §483.25(a)(1). This includes the resident's ability to:

      i.     "Bathe, dress and groom" 42 CFR §483.25(a)(1)(i);
      ii.    "Transfer and ambulate" 42 CFR §483.25(a)(1)(ii);
     iii.    "Toilet" 42 CFR §483.25(a)(1)(iii);
     iv.    "Eat" 42 CFR §483.25(a)(1)(iv); and
      v.    "Use speech, language, or other functional communication systems" " 42 CFR §483.25(a)(1)(v).

aa.    ensure that "a resident who is unable to carry out activities of daily living receives the necessary services to maintain good nutrition, grooming, and personal and oral hygiene" 42 CFR §483.25(a)(3);

bb.    ensure that "a resident who is incontinent of bladder receives appropriate treatment and services to prevent urinary tract infections and to restore as much normal bladder function as possible" 42 CFR §483.25(d)(2);

cc.    ensure that "a resident who enters a facility without a limited range of motion does not experience a reduction in range of motion unless that resident's clinical condition demonstrates that a reduction in range of motion is unavoidable" 42 CFR §483.25(e)(1);

dd.    ensure that "a resident with a limited range of motion receives appropriate treatment and services to increase range of motion and/or prevent further decrease in range of motion" 42 CFR §483.25(e)(2);

ee.    ensure that "a resident who displays mental or psychosocial adjustment difficulty, receives appropriate treatment and services to correct the assessed problem" 42 CFR §483.25(f)(1);

ff.    ensure that "a resident whose assessment did not reveal a mental or psychosocial adjustment difficulty does not display a pattern of decreased social interaction and/or increased withdrawn, angry, or depressive behaviors, unless the resident's clinical condition demonstrates that such a pattern was unavoidable" 42 CFR §483.25(f)(2);

gg.    ensure that "each resident receives adequate supervision and assistance devices to prevent accidents" 42 CFR §483.25(h)(2);

hh.    "ensure that a resident maintains acceptable parameters of nutritional status" 42 CFR §483.25(i)(1);

ii.    "ensure that a resident receives a therapeutic diet when there is a nutritional problem" 42 CFR §483.25(i)(2);

jj.    "provide each resident with sufficient fluid intake to maintain proper hydration and health" 42 CFR §483.25(j);

kk.    avoid administering any unnecessary drugs. An unnecessary drug is any drug when used:

        i.   In excessive dose. 42 CFR §483.25(l)(i);

       ii.   For excessive duration. 42 CFR §483.25(l)(ii);

      iii.   Without adequate monitoring. 42 CFR §483.25(l)(iii);

      iv.   Without adequate indications for its use. 42 CFR §483.25(l)(iv);

       v.   In the presence of adverse consequences which indicate the dose should be reduced or discontinued. 42 CFR §483.25(l)(v);

      vi.   Any combinations of the reasons above. 42 CFR §483.25(l) (vi).

ll.     "ensure that residents are free of any significant medication errors" 42 CFR §483.25(m)(2);

mm.    provide sufficient nursing staff to provide "nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care" 42 CFR §483.30;

nn.     "provide each resident with a nourishing, palatable, well-balanced diet that meets the daily nutritional and special dietary needs of each resident" 42 CFR §483.35;

oo.     "assist residents in obtaining routine and emergency dental care" 42 CFR §483.55;

pp.     "provide pharmaceutical services (including procedures that assure the accurate acquiring, receiving, dispensing, and administering of all drugs and biologicals) to meet the needs of each resident" 42 CFR §483.60;

qq.     "establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of disease and infection" 42 CFR §483.65;

rr.     document in a prominent part of the resident's record whether or not the resident has executed an advanced directive   42 CFR §489.102(a)(2);

ss.     comply with State laws regarding advanced directives. 42 CFR §489.102(a)(4);

tt.     provide services for residents on a continuing twenty-four (24) hour basis and shall maintain or improve physical, mental and psychosocial well-being under plan of care" 7 NMAC 9.2.2;

uu.    allow residents to "present grievances on one's own behalf or through others to the facility's staff or administrator, to public

officials or to any other person without justifiable fear of reprisal" 7 NMAC 9.2.22(C);

vv.  require all employees and providers to treat its residents with courtesy, respect and full recognition of one's dignity and individuality 7 NMAC 9.2.22(F);

ww.  allow its residents to be free from mental and physical abuse, and be free from chemical and physical restraints except as authorized in writing by a physician for a specified and limited period of time and documented in the resident's medical records. 7 NMAC 9.2.22 (L);

xx.  allow its residents to receive adequate and appropriate care within the capacity of the facility. 7 NMAC 9.2.22 (M);

yy.  "each resident shall be kept comfortably clean and well groomed" 7 NMAC 9.2.42 (A)(1);

zz.  "each resident shall have clean clothing as needed to present a neat appearance and to be free of odors" 7 NMAC 9.2.42 (A)(3);

aaa.  require its nursing personnel to "employ appropriate nursing management techniques to promote the maintenance of skin integrity and to prevent development of decubiti filed in the resident's clinical record" 7 NMAC 9.2.42 (B);

bbb.  assist residents who require assistance with food or fluid intake as necessary. 7 NMAC 9.2.42 (E)(3);

ccc.  require its nursing personnel to "provide care, including proper hydration, designated to maintain current functioning and to improve the resident's ability to carry out activities of daily living" 7 NMAC 9.2.42 (B)(2);

ddd.  notify a resident's physician and designated family member of any significant accident, injury or adverse change in resident's condition. 7 NMAC 9.2.43 (A); and

eee.  require that there was "sufficient nursing service personnel assigned to care for the specific needs of each resident on each tour of duty." 7 NMAC 9.2.51 (A);

56.   As a direct and proximate result of the DEFENDANTS' actions and omissions in violation of state and federal law and regulations, Mr. Spradlin and his statutory heirs under the Wrongful Death Act suffered the following damages: the reasonable expenses of his medical care and treatment, the reasonable expenses of his funeral and burial; the

18

monetary worth of his pain and suffering; the monetary worth of his life and the loss of the value of his life. The neglect that resulted in Mr. Spradlin's death was accompanied by aggravating circumstances for which the Plaintiff is entitled to additional damages.

57.     The statutes and regulations cited above set the minimum standards the DEFENDANTS are required to meet in providing care to patients such as Mr. Spradlin.

58.     The statutes and regulations cited above were enacted for the benefit or protection of a class of the public, of which Mr. Spradlin was a member of at all times material to this action.

59.     The DEFENDANTS violated these statutes and regulations in caring for Mr. Spradlin and other similarly situated residents at the NURSING HOME.

60.     As a proximate result of the violation of the statutes and regulations by the DEFENDANTS, which constitutes negligence per se, Mr. Spradlin suffering injuries and damages, which resulted in his death on March 11, 2009.

61.     The actions of the DEFENDANTS, through their agents or employees, were malicious, willful reckless, and/or done with wanton disregard for Mr. Spradlin, giving rise to punitive damages against the DEFENDANTS.

62.     Plaintiffs request that the jury be advised of these duties in accordance with an appropriate jury instruction.

## COUNT IV
## NEGLIGENT OR INTENTIONAL MISREPRESENTATION

63.     All allegations set forth above in paragraphs 1 through 62 are incorporated by reference as if fully set forth herein.

64.     Around the time of Mr. Spradlin's admission to the NURSING HOME and on numerous occasions thereafter, the Defendants represented to Plaintiff and to state and federal agencies that they had sufficient numbers of nurses and nurses' aides on staff at their facility to provide proper care and treatment to Mr. Spradlin and other residents at their facility.

65.    Around the time of Mr. Spradlin's admission to the NURSING HOME and on numerous occasions thereafter, Defendants made representations about the quality of care Mr. Spradlin would receive at their facility to Plaintiff and to state and federal agencies.

66.    The above representations were in fact false, and the Defendants knew, or should have known, that they were false at the time the representations were made.  The Defendants intended to induce Plaintiff and/or his agents and representatives to act or refrain from acting in reliance upon the representations.

67.    As a direct and proximate result of Defendant's misrepresentations, Mr. Spradlin and his family were denied the accurate information to which they were entitled and needed, to ensure that Mr. Spradlin received adequate care while at their facility.

68.    Plaintiff justifiably relied upon the representations in acting or refraining from acting and as a result sustained damages.

69.    As a direct and proximate result of Defendants' misrepresentations, Mr. Spradlin did not receive the necessary medical treatment he needed, which caused him great pain and suffering in the last months of his life.

70.    The misrepresentations of Defendants directly and proximately caused or contributed to Mr. Spradlin's death or decreased his chance of survival.

71.    As a direct and proximate result of Defendants' misrepresentations, Mr. Spradlin and his statutory heirs under the Wrongful Death Act suffered damages, which are incorporated herein by reference.

## COUNT V
## VIOLATION OF THE UNFAIR TRADE PRACTICES ACT

72.    All allegations set forth above in paragraphs 1 through 71 are incorporated by reference as if fully set forth herein.

73.    Upon information and belief, the DEFENDANTS held the NURSING HOME out to Mr. Spradlin and his family as being a facility that provided services that would meet, if not exceed, the standards of care established for nursing homes.

74.     The actions of Defendants set forth herein, constitute unfair, deceptive, or unconscionable practices prohibited by NMSA 1978 §§ 57-12-1 through 57-12-20.

75.     Defendants, through agents and employees, violated the Unfair Trade Practices Act by knowingly engaging in unfair, deceptive or unconscionable trade practices in one or more of the following ways:

      a.   Making false or misleading oral or written statements or other representations in connection with the sale of its services, which tended to or did deceive or mislead Mr. Spradlin and his family, including, but not limited to:

           i.   representing that their services have characteristics that they did not have, in violation of NMSA 1978, § 57-12-2(D)(5) and NMSA 1978, § 57-12-3;

           ii.   representing that their services were of a particular standard, quality or grade when they were not of such standard, quality or grade, in violation of NMSA 1978, § 57-12-2(D)(7) and NMSA 1978, § 57-12-3;

           iii.   failing to provide the quality of services contracted for by Mr. Spradlin and his family, in violation of NMSA 1978, § 57-12-2(D)(17) and NMSA 1978, § 57-12-3;

      b.   Engaging in acts or practices in connection with the offering of services for sale, which to the detriment of Mr. Spradlin and his family;

           i.   took advantage of the lack of knowledge, ability, experience or capacity of Mr. Spradlin and his family to a grossly unfair degree, in violation of NMSA 1978, § 57-12-2(E)(1) and NMSA 1978, § 57-12-3; or

           ii.   resulted in a gross disparity between the value received by Mr. Spradlin and the price paid for the contracted services, in violation of NMSA 1978, § 57-12-2(E)(2) and NMSA 1978, § 57-12-3.

76.     As a direct and proximate result of the willful, unfair, deceptive, or unconscionable trade practices of Defendants, Mr. Spradlin was harmed.

77.     Defendants should reimburse all amounts paid to Defendants on behalf of Mr. Spradlin, pay an amount necessary to punish and deter Defendants from engaging in false advertising as well as attorneys' fees.

## COUNT IV
## PUNITIVE DAMAGES

78.    All allegations set forth above in paragraphs 1 through 77 are incorporated by reference as if fully set forth herein.

79.    As a direct and proximate result of the negligence and other wrongful conduct of the Defendants as set out above, Mr. Spradlin suffered injuries including, but not limited to, dehydration, malnutrition, weight loss, falls resulting in serious injuries, infections, sepsis, pain and suffering, mental anguish, humiliation, and wrongful death.

80.    The longevity, scope and severity of Defendants' failures and actions and their deliberately indifferent actions with regard to the welfare and safety of helpless residents such as Mr. Spradlin constitute gross negligence, willful, wanton, reckless, malicious, and/or intentional misconduct.

81.    Such conduct was undertaken by Defendants without regard to the health and safety consequences to those residents, such as Mr. Spradlin entrusted to their care. Moreover such conduct evidences such little regard for their duties of care, good faith, and fidelity owed to Mr. Spradlin as to raise a reasonable belief that the acts and omissions set forth above are the result of conscious indifference to Mr. Spradlin's rights and welfare.

82.    Plaintiff seeks compensatory and punitive damages in an amount to be determined by the jury, plus costs and any other relief to which Plaintiff is entitled by law.

83.    For damages to be determined by the jury, in an amount to adequately compensate Plaintiff for all the injuries and damages sustained;

84.    For all general and special damages caused by the alleged conduct of Defendants;

85.    For the costs of litigating this case;

86.    For punitive damages sufficient to punish Defendants for their egregious conduct and to deter Defendants and others from repeating such atrocities; and

89.    For all other relief to which Plaintiff is entitled under New Mexico law.

Attorneys for Plaintiff:

Mary Ellen Spiece
Wilkes & McHugh, P.A.
2355 E. Camelback Road, Suite 910
Phoenix, AZ 85016
(602) 553-4552

**EXHIBIT** _____/_____

STATE OF NEW MEXICO
COUNTY OF LEA
FIFTH JUDICIAL DISTRICT

IN THE MATTER OF THE WRONGFUL
DEATH OF DOUGLAS SPRADLIN

No. _CV-2010-111_

## ORDER APPOINTING PERSONAL REPRESENTATIVE TO PURSUE WRONGFUL DEATH CLAIM IN ACCORDANCE WITH § 41-2-3 NMSA 1978

This matter comes before the Court on the Petition of Jason Spradlin, for appointment as personal representative of the wrongful death estate of Douglas A. Spradlin, Jr. The Court has reviewed the petition, and being fully advised in the premises, finds that good cause exists for granting the petition for appointment of personal representative of the wrongful death estate of Douglas A. Spradlin, Jr.

IT IS HEREBY ORDERED that the petition for appointment of personal representative for the wrongful death action is granted, and Jason Spradlin is hereby appointed as personal representative of the wrongful death estate of Douglas A. Spradlin, Jr., decedent, without bond, in an unsupervised administration.

_____
District Court Judge

Submitted by:

Suzanna R. Valdez
Valdez and White Law Firm, LLC
P.O. Box 25646
Albuquerque, N.M. 87125
(505) 345-0289 - Phone
(505) 345-2573 - Fax

STATE OF NEW MEXICO
COUNTY OF LEA
FIFTH JUDICIAL DISTRICT

IN THE MATTER OF THE WRONGFUL
DEATH OF DOUGLAS SPRADLIN

No. *CV-2010-111*

## ACCEPTANCE OF APPOINTMENT AS PERSONAL REPRESENTATIVE

Petitioner, Jason Spradlin, hereby accepts the appointment as personal representative of the wrongful death estate of Douglas A. Spradlin, Jr. in the above captioned cause.

Jason Spradlin

Respectfully submitted,

Valdez and White Law Firm, LLC

By:
Suzanna R. Valdez
P.O. Box 25646
Albuquerque, N.M. 87125
Phone: (505) 345-0289
Facsimile: (505) 345-2573

**EXHIBIT B**

# ADMISSION CONTRACT
## New Mexico

This Admission Contract ("Contract") is executed as of _8/31_ _____, 20_06_ by and among _HOBBS HEALTH CARE_, a corporation located at _5715 N LOVINGTON HWY_, _HOBBS_, _NM_ _88240_ (the "Health Care Center"), and _DOUG SPRADLIN_ ("Patient/Resident"), and/or _MELISSA HARDY_ ("Fiduciary Party"), if any.

**IN CONSIDERATION OF THE MUTUAL PROMISES CONTAINED IN THIS CONTRACT, THE PARTIES AGREE AS FOLLOWS:**

### I. GENERAL PROVISIONS

1. <u>Term</u>. Patient/Resident agrees to reside in the Health Care Center. This Contract shall remain in effect until terminated by Patient/Resident in accordance with applicable law or terminated by the Health Care Center as provided in Article IV.

2. <u>Fiduciary Parties</u>. Fiduciary Party shall act on behalf of Patient/Resident for all purposes permitted under applicable law. Fiduciary Party shall pay fees and charges incurred hereunder by or on behalf of Patient/Resident from Patient's/Resident's assets or estate. Fiduciary Party may act in more than one capacity and shall be bound by the applicable terms and conditions of this Contract. Except as otherwise expressly provided to the contrary herein, if Fiduciary Party uses due care, Fiduciary Party will not become personally liable for the payment of Patient's/Resident's fees and charges by signing this Agreement. Patient/Resident acknowledges and consents to the execution of this Contract by Fiduciary Party.

### II. FEES, PAYMENTS and SERVICES

1. <u>Charges and Fees</u>

   A. <u>Itemized Charges</u>. The parties acknowledge that a copy of an itemized list of charges for all services and products, including the basic daily rate, was provided to Patient/Resident when this Contract was executed.

   B. <u>Late Payment Fee</u>. The Health Care Center may charge Patient/Resident a late payment fee or interest at a rate equal to the lesser of (a) Eighteen percent (18%) per annum (18%) or, if lesser, the highest percentage allowed by law, on all charges (exclusive of interest) for which Patient/Resident is liable that are outstanding for more than 30 days from the date on which the Patient/Resident was billed for said charges or (b) the amount set forth in any Contract Addendum.

Page 1 of 6

C. **Fees for Collecting Outstanding Bills.** The Health Care Center shall be entitled to all costs of collection, including court costs and reasonable attorney's fees reasonably incurred to collect fees and charges not paid when due, to the fullest extent permitted by applicable law. To the extent permitted by applicable law, in disputes arising from this Contract, the prevailing party shall be entitled to attorney's fees.

D. **Refunds.** On termination of this Contract, if any fees or charges have been prepaid, any excess shall be refunded to Patient/Resident or authorized representative in accordance with applicable law. All periodic fees due shall be prorated to the date of termination.

E. **Changes in Charges and Fees.** Charges and fees for services and products provided by the Health Care Center may be changed from time to time. Services and products may also be curtailed or eliminated completely, as permitted by applicable law. The Health Care Center shall notify Patient/Resident and any other party liable for charges and fees in accordance with applicable law.

2.   **Payment.** The Patient's/Resident's responsibility to pay for his or her care at the Health Care Center is described in the Contract Addendum, which is incorporated herein by reference. Patient's/Resident's responsibility for payment may change if the third party payor responsible for the payment of Patient's/Resident's charges changes. Patient/Resident shall execute a new Contract Addendum describing his or her new responsibilities for payment whenever his or her third party payor changes.

3.   **Medicare/Medicaid Certification.**

  (a)   The Health Care Center _____ (is) _____ is not certified by the Medicare Program to accept Medicare patients.

  (b)   The Health Care Center _____ (is) _____ is not certified by the Medicaid Program to accept Medicaid patients.

## III. PATIENT'S/RESIDENT'S RESPONSIBILITY AND AUTHORIZATIONS

1.   **Patient/Resident Responsibilities.** Patient/Resident shall abide by the reasonable policies and rules of the Health Care Center, which are included herein by reference.

2.   **Responsibility for Personal Items.** Patient/Resident shall provide all items for his or her personal use, including, but not limited to, daytime clothing, personal items, and other items as listed in the Health Care Center's policies and rules. Patient/Resident shall be permitted to use personal possessions to the extent possible without interference upon the rights, health or safety of others. The Health Care Center shall not be liable for Patient's/Resident's clothing or personal items, except to the extent required by applicable law.

Page 2 of 6

3.   Living Quarters.   Health Care Center shall initially place the Patient/Resident in accommodations that, in the opinion of the Health Care Center, will result in a compatible Patient/Resident relationship and/or appropriate and efficient care by the Health Care Center. However, the Health Care Center reserves the right to transfer Patient/Resident to other living quarters if required or permitted by law or for efficient management (to the extent permitted by applicable law and the Health Care Center's polices) and will notify Patient/Resident, in accordance with applicable law.

4.   Request for Admission and Treatment.   By executing this Contract, Patient/Resident represents that Patient's/Resident's condition is such that Patient/Resident requires the care and treatment services provided by the Health Care Center and is requesting admission to the Health Care Center of his or her own free will for purposes of receiving the care and treatment services normally provided by the Health Care Center for his or her level of care, including, but not limited to:

   (a)   nursing services;
   (b)   dietary services;
   (c)   activities program services;
   (d)   room/bed maintenance services;
   (e)   routine personal hygiene services;
   (f)   medically related social services; and
   (g)   medical care services recommended by his or her physician.

   By executing this Contract, Patient/Resident authorizes the Health Care Center and the Patient's/Resident's physician or physician's designee to administer the above described care and treatment services.   Patient/Resident acknowledges that no warranty or guarantee has been made by the Health Care Center concerning Patient's/Resident's condition or any changes related thereto.

5.   Medical Services and Equipment.   Except as specified in the Contract Addendum, Patient/Resident shall be financially responsible for all medical and other services, equipment and supplies necessary for Patient's/Resident's personal use.   Patient/Resident hereby authorizes the Health Care Center to bill Medicare Part B or any other applicable payor for equipment, supplies and services furnished directly by the Health Care Center or by others to Patient/Resident.

   Patient/Resident hereby assigns to the Health Care Center his or her right to reimbursement for any services rendered to Patient/Resident and authorizes the Health Care Center to receive payments for such services pursuant to this assignment.   Patient/Resident is not required to purchase any item or service as a condition of admission or continued stay in the Health Care Center.

Page 3 of 6

6.   Emergency Medical Treatment.  Health Care Center is hereby authorized to provide or arrange for any emergency medical treatment deemed necessary for Patient/Resident or to arrange for the Patient's/Resident's transfer to a hospital or other facility for such purposes.

## IV.  TERMINATION OR MODIFICATION OF CONTRACT

1.   Change in Patient's/Resident's Health.  If the physical or mental condition of Patient/Resident changes such that Patient/Resident requires a higher level of care and the Health Care Center determines that it cannot provide appropriate care, Patient/Resident will be transferred, in accordance with applicable law, to another facility for appropriate care and this Contract shall terminate unless accommodations are reserved as provided in the Contract Addendum. If Patient/Resident passes away, this Contract shall terminate on the day of Patient's/Resident's death.

2.   Involuntary Transfer or Discharge.  The Health Care Center reserves the right to involuntarily transfer or discharge Patient/Resident, in accordance with applicable law, following written notice and transfer or discharge planning.  This Contract shall terminate on the date of involuntary transfer or discharge.  Except in an emergency or other circumstance permitted by law, a Patient/Resident normally will be provided with at least thirty (30) days advance written notice of discharge or involuntary transfer within the Health Care Center.

## V.  REPRESENTATIONS, INTERPRETATIONS AND COMPLETENESS

1.   Patient/Resident Representations.   Admission of the Patient/Resident is based on the representations contained in the admission documents.  The Patient/Resident and Fiduciary Party represent that the statements made in all admissions documents are true, correct and complete without omissions of any material facts.  Furthermore, the Patient/Resident and Fiduciary Party shall promptly inform the Health Care Center in writing of any changes in the statements included in all admission documents.

2.   Acknowledgement of Patient's/Resident's Financial Responsibility.  While the Health Care Center may assist in the procurement of third-party payor coverage, including Medicaid, Medicare and other insurance coverage, for the cost of residency and treatments, the Patient/Resident and his or her legal representative acknowledge that the Health Care Center does not guarantee coverage or the amount of payment by any payor source.  The Patient/Resident acknowledges that assistance by the Health Care Center does not alter his or her responsibility to satisfy debts incurred for services rendered.

3.   Health Care Center Representations.  The Health Care Center utilizes reasonable efforts to provide all goods and services to Patient/Resident in accordance with applicable law and the representations contained herein.  However, because the provision of health care services is a personalized service requiring interventions on many occasions by many persons,

Page 4 of 6

Patient/Resident acknowledges that the standards and/or representations will not be satisfied from time to time.

4. Interpretation of Provisions. Wherever possible, each provision of this Contract shall be interpreted in such manner to be effective under applicable law. If at any time any provision of this Contract shall be prohibited by or invalid under applicable law, such provision shall be severed from the Contract and the remaining provisions of this Contract shall be unaffected.

5. Complete Agreement. This Contract, the Contract Addendum(s), and the documents listed on the Acknowledgement page attached to this Contract and made a part hereof constitute the entire contract between the parties. This Contract may not be amended except in writing executed by the parties or their successors.

## VI. ARBITRATION

Pursuant to the Federal Arbitration Act, any action, dispute, claim, or controversy of any kind (e.g., whether in contract or in tort, statutory or common law, legal or equitable, or otherwise) now existing or hereafter arising between the parties in any way arising out of, pertaining to or in connection with the provision of healthcare services, any agreement between the parties, the provision of any other goods or services by the Health Care Center or other transactions, contracts or agreements of any kind whatsoever, any past, present or future incidents, omissions, acts, errors, practices, or occurrence causing injury to either party whereby the other party or its agents, employees or representatives may be liable, in whole or in part, or any other aspect of the past, present, or future relationships between the parties shall be resolved by binding arbitration administered by the National Health Lawyers Association (the "NHLA").

**THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ AND UNDERSTOOD THIS CONTRACT, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO ALL OF ITS TERMS**

_DOUG SPRADLIN_

Printed Name

Patient/Resident

Date: _08/31/04_

_110 E CORBETT APT 12._
Address
_P.O. Box 5013_

_HOBBS, NM 88240_

Page 5 of 6

11/17/2010  11:14     5753928676                    HOBBS HEALTHCARE                    PAGE  02

**AND/OR**

_Melissa Hardy_ (signature)

**Fiduciary Party (if any)**                      MELISSA HARDY

                                                  **Printed Name**

Fiduciary Party executes this Contract in the capacity(y)(ies) checked below and shall provide evidence of Fiduciary Party's capacity(y)(ies) at the time of signing this Contract:

☐ Guardian appointed by court. Includes:
   ☐ Guardian of the person for purposes of admitting Patient/Resident to the Health Care Center, or
   ☐ Guardian of property for purposes of handling Patient's/Resident's finances, or
   ☐ Both
☐ Attorney-In-Fact under validly executed power of attorney
☐ Conservator of the estate approved by court
☐ Trustee under written trust agreement
☐ Personal Representative designated in writing by Patient/Resident to exercise rights protected under the Social Security Act and other purposes permitted by law
☐ Legal Representative, as defined in rules and regulations implementing the Omnibus Reconciliation Act of 1987 (OBRA), amending 42 U.S.C. § 1395, et. seq., having legal access to Patient's/Resident's income or resources
☐ Representative Payee within the meaning of the Social Security Act who receives Social Security benefits for and on behalf of Patient/Resident
☒ Immediate Family Member

_08/31/06_                           _1520 Casa Bonita_
**Date**                             _~~1500 N Grimes~~_
                                     **Address**
                                     _P. O. Box 233_

                                     _HOBBS, NM 88240_

By: _Janice A. Fagan_ (signature)        _JANICE A. FAGAN_
    **Health Care Center Representative**     **Printed Name**

_08/31/06_
**Date**

**EXHIBIT C**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| THI OF NEW MEXICO AT HOBBS CENTER, LLC, and THI OF NEW MEXICO, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. _____ |
| JASON SPRADLIN, as Personal Representative of the Wrongful Death Estate of Douglas A. Spradlin, Jr., Deceased, | ) ) ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT TO COMPEL ARBITRATION

COMES NOW Plaintiffs THI of New Mexico at Hobbs Center, LLC ("Hobbs" or "Facility") and THI of New Mexico, LLC ("THI-NM"), and for their cause of action, allege as follows:

## PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Hobbs is a Delaware limited liability company.  Plaintiff Hobbs' sole member is Plaintiff THI-NM, which is itself a Delaware limited liability company that has a single member, THI of Baltimore, Inc., a Delaware corporation with its principal place of business in Maryland.  Thus, for purposes of federal diversity jurisdiction, Plaintiffs Hobbs and THI-NM are citizens of the States of Delaware and Maryland.

2.      Defendant Jason Spradlin is an Arizona citizen and a surviving son of Douglas A. Spradlin, Jr., deceased.

3.      Based on information and belief, Douglas A. Spradlin, Jr. ("Mr. Spradlin") was a New Mexico citizen at the time of his death and at all times relevant to this Complaint.

EXHIBIT
1

4.     This Court has jurisdiction over the subject matter of this action and the parties hereto pursuant to 28 U.S.C. § 1332(a)(1) and 9 U.S.C. § 4 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.     This judicial district is a proper venue under 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this district.

## FACTUAL BACKGROUND

6.     On August 31, 2006, Mr. Spradlin's daughter, Melissa Hardy, pursuant to a "Durable Power of Attorney for Financial and Healthcare Decision Making" ("Power of Attorney") executed an "Admission Contract—New Mexico" ("Admission Contract") to obtain care for Mr. Spradlin at Hobbs.  A true and correct copy of the Admission Contract is attached as **Exhibit A**. Section VI of the Admission Contract contains a mandatory arbitration provision ("Arbitration Provision").

7.     Mr. Spradlin's assent to the Arbitration Provision thus was a precondition to his admission to and treatment at the Facility.  A true and correct copy of the Power of Attorney is attached as **Exhibit B**.

### A.     Power of Attorney

8.     Pursuant to the Power of Attorney, Mr. Spradlin appointed Ms. Hardy and Jason Spradlin as his attorneys-in-fact.  (Exhibit B at 1.)  In the Power of Attorney, Mr. Spradlin check-marked and initialed a space indicating his approval of a pre-printed legend that reads: "If more than one person is appointed to serve as my Decision-maker, then each may act alone and independently of each other."  (Exhibit B at 1.)

9.     The Power of Attorney enumerates eighteen areas of responsibility as to which Mr. Spradlin could choose to confer (or limit) authority upon his attorneys-in-fact, including paragraph 9 for "claims and litigation" and paragraph 16 for "decisions relating to . . . nursing care, medication, hospitalization, [and] institutionalization, in a nursing home or other facility and home health care." (Exhibit B at 2.) Mr. Spradlin initialed paragraphs 9 and 16, and all but one of the other paragraphs, expressly conferring upon Ms. Hardy authority to make decisions for him regarding such matters. (Exhibit B at 1-2.)

10.     On the second page of the Power of Attorney, Mr. Spradlin placed his initials in the space provided indicating his express approval that "[t]his power of attorney is effective **immediately** and shall not be affected by my incapacity or lapse of time, but will terminate upon my death unless I have revoked it prior to my death." (Exhibit B at 2 (bold in original).) There is no indication that Mr. Spradlin ever revoked the Power of Attorney.

11.     At page three of the Power of Attorney, directly above the line where Mr. Spradlin signed his name, he indicated that he was "GIVING AND GRANTING unto my said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises fully, with the same force and effect, and to all intents and purposes, as I might or could do if personally present, with full power of substitution and revocation, as I might or could do if personally present . . . ." (Exhibit B at 3.)

**B.     Admission Contract/Arbitration Provision**

12.     The Admission Contract was executed "by and among" Hobbs, Mr. Spradlin ("Patient/Resident"), and Ms. Hardy who is denominated as the "Fiduciary Party." (Exhibit A at 1.) Directly above the signature lines where Ms. Hardy signed her name for Mr. Spradlin, Section VI of the Admission Contract, entitled **"ARBITRATION,"** reads:

Pursuant to the Federal Arbitration Act, *any action, dispute, claim, or controversy of any kind (e.g., whether in contract or in tort, statutory or common law, legal or equitable, or otherwise)* now existing or hereafter arising between the parties *in any way arising out of, pertaining to or in connection with the provision of healthcare services*, any agreement between the parties, the provision of any other goods or services by [Hobbs] or other transactions, contracts or agreements of any kind whatsoever, any past, present or future incidents, omissions, acts, errors, practices, or occurrence causing injury to either party whereby the other party or its agents, employees or representatives may be liable, in whole or in part, or any other aspect of the past, present, or future relationships between the parties *shall be resolved by binding arbitration* administered by the National Health Lawyers Association (the "NHLA").[1]

**THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ AND UNDERSTOOD THIS CONTRACT, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO ALL OF ITS TERMS.**

(Exhibit A at 5 (bold/all caps in original; bold/italics added; footnote added).)

13.    The Admission Contract makes clear that Ms. Hardy signed it not only on behalf of Mr. Spradlin, but also in her own personal capacity.

14.    Section I(2) of the Admission Contract specifically provides that "[Ms. Hardy] may act in more than one capacity and *shall be bound by the applicable terms and conditions of this Contract*." (Exhibit A at 1, § I(2) (emphasis added).)  In addition, Ms. Hardly expressly **"ACKNOWLEGE[D] THAT [SHE] HAS READ AND UNDERSTOOD THIS [ADMISSION] CONTRACT, AND *[SHE] VOLUNTARILY CONSENTS TO ALL ITS TERMS*."** (Exhibit A at 5, § VI (bold and all caps in original; emphasis added).)

15.    The Admission Contract further provides that "[a]dmission of [Mr. Spradlin] is based on the representations contained in the admission documents.  [Mr. Spradlin] and [Ms. Hardy] represent that the statements made in all admissions documents are true, correct and complete without omissions of any material facts.  Furthermore, [Mr. Spradlin] and [Ms. Hardy]

---

[1] The National Health Lawyers Association is now known as the American Health Lawyers Association.  (*See* www.ahla.org.)

shall promptly inform [Hobbs] in writing of any changes in the statements included in all admission documents." (Exhibit A at 4, § V(1).)

16.     Section V(4) of the Admission Contract provides that "[w]herever possible, each provision of this Contract shall be interpreted in such manner to be effective under applicable law." (Exhibit A at 5, § V(4).)

**C.     State Court Action**

17.     Upon information and belief, Mr. Spradlin died on March 11, 2009.

18.     Upon information and belief, Defendant later was appointed to act as the personal representative of Mr. Spradlin's wrongful death estate.

19.     On June 29, 2011, Defendant filed a civil action in the First Judicial District Court, New Mexico, *Spradlin v. THI of New Mexico at Hobbs Center, LLC, et al.,* D-0101-CV-2011-2107 ("State Court Action"). A true and correct copy of Defendant's complaint ("Complaint") is attached as **Exhibit C**. In the State Court Action, Defendant alleges multiple claims against Plaintiffs, all of which are directly related to care and treatment that Mr. Spradlin received at Hobbs: wrongful death (Count I), negligence (Count II), negligence per se (Count III), negligent or intentional misrepresentation (Count IV), violation of New Mexico's Unfair Trade Practices Act (Count V), and punitive damages (Count VI). (Exhibit C at 9-23.)

**CAUSE OF ACTION TO COMPEL ARBITRATION**
**(Federal Arbitration Act, 9 U.S.C. § 4)**

20.     Plaintiffs incorporate by reference the allegations set forth above, as if set forth fully herein.

21.     The Federal Arbitration Act ("FAA") mandates arbitration of claims that are subject to a written arbitration agreement and that affect interstate commerce. Specifically, the FAA

requires arbitration where (a) there is a valid, written arbitration agreement, and (b) a dispute is

within the scope of the agreement.  Section 2 of the FAA provides that:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . *shall be valid, irrevocable, and enforceable*, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added).  Section 4 of the FAA further provides that:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . .  The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

9 U.S.C. § 4.

    22.    In actions involving written arbitration agreements, the FAA requires that such

actions be stayed pending resolution of the arbitration process:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit or proceeding is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added).

    23.    Pursuant to the Power of Attorney, Ms. Hardy signed the Admission Contract

containing the Arbitration Provision on behalf of Mr. Spradlin.  The Power of Attorney gave Ms.

Hardy unrestricted authority to act as Mr. Spradlin's agent, including in matters relating to

"claims and litigation" and "decisions relating to . . . nursing care . . . in a nursing home or other

facility[,]" and home health care." (Exhibit B at 2.) The Power of Attorney thus authorized Ms. Hardy to execute the Admission Contract, and to bind Mr. Spradlin to the Arbitration Provision contained therein. Accordingly, Mr. Spradlin was bound by the Admission Contract, including its Arbitration Provision.

24.     Defendant who "stands in the shoes" of Mr. Spradlin as the representative of his wrongful death estate also is bound by the Arbitration Provision. *See* Wrongful Death Act, NMSA 1978, § 41-2-1 (providing a cause of action for a decedent's beneficiaries based on alleged actions that, "if death had not ensued, [would] have entitled the party injured to maintain an action and recover damages"); *see also Stang v. Hertz Corp.*, 463 P.2d 45, 55 (N.M Ct. App. 1969) ("Our wrongful death act 'preserves' the right of action [] and transmits to the personal representative the cause of action which the injured person would have had if death had not ensued." (citation omitted)), *aff'd*, 467 P.2d 14 (N.M. 1970).

25.     In addition to being a party to the Admission Contract in his own right, Mr. Spradlin was a third-party beneficiary of the Admission Contract, including the Arbitration Provision, between Ms. Hardy and Hobbs. Defendant thus is bound to resolve by arbitration "*any* action, dispute, claim, or controversy" with Plaintiffs, including but not limited to any alleged claim based "in contract or in tort, statutory or common law, legal or equitable, or otherwise." (Exhibit A at 5, § VI (emphasis added).)

26.     Defendant's causes of action against Plaintiffs in the State Court Action are within the scope of, and subject to, the Arbitration Provision. The Arbitration Provision bars the assertion of these claims in any civil action and, instead, requires that they be resolved by arbitration. Defendant's State Court Action is thus in direct violation of the Arbitration Provision.

27.    The Admission Contract constitutes a "contract evidencing a transaction involving commerce" within the meaning of 9 U.S.C. § 2.  Among other things, Mr. Spradlin was a Medicare patient, like other residents at Hobbs.  Medicare paid a portion of the costs of Mr. Spradlin's care, and the care of other residents, while he lived at the Facility.  In addition, Hobbs was certified to, and did, receive payment from the New Mexico Medicaid program, a substantial portion of which is funded by the Federal government.  (Exhibit A at 2, § II(3).)  The Medicaid program paid for a portion of Mr. Spradlin's care and treatment while he resided at the Facility. Hobbs also purchased equipment, goods and services from vendors in other States that were used for the treatment and care of Mr. Spradlin and other residents.  These activities, in the aggregate, affect and involved interstate commerce, thus subjecting the Arbitration Provision to the FAA. Moreover, the parties expressly agreed that the Arbitration Provision itself would be governed by the FAA.  (Exhibit A at 5, § VI.)

28.    Although Plaintiff THI-NM was not a signatory to the Admission Contract containing the Arbitration Provision, the claims that Defendant asserts against THI-NM in the State Court Action nonetheless are subject to it.

29.    Under the Arbitration Provision, the parties agreed to arbitrate any claims "whereby the other party or its agents, employees or representatives may be liable . . . ."  (Exhibit A at 5, § VI.)  Defendant's Complaint alleges, in part, that "at all relevant times, the DEFENDANTS [including THI-NM] were the knowing *agents* and/or alter-egos of one another, inclusive, and that the DEFENDANTS' officers, directors, and managing agents, directed, approved, and/or ratified the conduct of each of the other DEFENDANTS' officers, agents and employees, and are therefore vicariously liable for the acts and/or omissions of their co-defendants, their agents and employees . . . ."  (Exhibit C ¶ 23 (emphasis added).)

30.     Defendant's Complaint further alleges that THI-NM itself "engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including [Hobbs], at all times material to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by [THI-NM] in the ownership, operation, management and/or control of [Hobbs]." (Exhibit C ¶ 10.) Accordingly, Defendant's alleged claims against THI-NM are within the scope of the Arbitration Provision.

31.     Defendant's claims against Plaintiff THI-NM also are subject to the Arbitration Provision pursuant to the doctrine of equitable estoppel because they are predicated on Defendant's allegations of substantially interdependent and concerted misconduct by non-signatory Plaintiff THI-NM, Plaintiff Hobbs and other defendants named in the State Court Action.

32.     Defendant's Complaint alleges that all of the parties sued as defendants in the State Court Action, including Plaintiffs here, are vicariously liable for each other's purported misconduct because they "were done in concert with each other and pursuant to a common design and agreement to accomplish a particular result, namely maximizing profits by operating the [Facility] in such a manner that [Hobbs] was underfunded and understaffed." (Exhibit C ¶ 24.)

33.     Defendant also alleges that all of the defendants named in the State Court Action, including THI-NM and Hobbs, "by their acts and omissions as alleged herein, operated pursuant to an agreement, with a common purpose and community of interest, with an equal right of control, and subject to participation in profits and losses, as further alleged herein, such that they operated a joint enterprise or joint venture, subjecting each of them to liability for the acts and omissions of each other." (Exhibit C ¶ 25.) Accordingly, the Arbitration Provision applies and Defendant is estopped from refusing to arbitrate the claims he as asserted against THI-NM.

34.     Equitable estoppel also compels Defendant to arbitrate her claims against Plaintiff THI-NM pursuant to the Arbitration Provision because the claims are based on THI-NM's alleged breaches of obligations and duties of care that spring from the Admission Contract, of which the Arbitration Provision is a part.

35.     The Admission Contract was the foundation of Hobbs' relationship with Mr. Spradlin.

36.     The statutory and common law duties and standards of care which Defendant alleges that Plaintiff THI-NM owed to Mr. Spradlin, but failed to fulfill, derive directly from the Facility's agreement in the Admission Contract to admit Mr. Spradlin as a *resident* and to provide services to him.  (*See* Exhibit A at 3, § III(4).)  Defendant's Complaint is replete with allegations which make this point clear.  (*See, e.g.,* Exhibit C ¶ 47 ("Defendants owed a duty to their *residents, including Mr. Spradlin*, to provide care[,] treatment, and services within accepted standards of care." (emphasis added)); *id.* ¶ 55 (listing state and federal statutes and regulations purportedly establishing "minimum standards" of care that skilled nursing facilities owe to *residents*, which Plaintiffs here allegedly violated "[i]n [their] treatment of Mr. Spradlin" (emphasis added)); *id.* ¶ 64 (alleging that Plaintiffs misrepresented "that they had sufficient numbers of nurses and nurses' aides on staff at their [F]acility to provide proper care and treatment to Mr. Spradlin and other *residents* at their [F]acility." (emphasis added).)

37.     Because the Admission Contract is the basis of Defendant's claims against Plaintiff THI-NM, Defendant is estopped from repudiating the validity of the Arbitration Provision, which is a part of the Admission Contract.

38.     Therefore, pursuant to the Arbitration Provision, FAA, and applicable law, Plaintiffs are entitled to an order compelling Defendant to submit her claims to arbitration and staying the State Court Action.

## PRAYER FOR RELIEF

WHEREFORE PREMISES CONSIDERED, Plaintiffs are entitled to, pray for, and demand a judgment:

A.      Ordering Defendant to arbitrate her claims asserted against Plaintiffs in the State Court Action, in accordance with the Arbitration Provision;

B.      Upon determining that the claims Defendant has asserted against Plaintiffs in the State Court Action are subject to the Arbitration Provision, staying the State Court Action from further proceedings pending a resolution of this matter through the arbitration process;

C.      Staying further proceedings in the action *sub judice* pending a conclusion of arbitration of Defendant's claims against Plaintiffs or, in the alternative, dismissing this matter without prejudice; and

D.      Ordering such other relief as the Court may deem just and proper.

Dated: September 6, 2011                    Respectfully submitted,

                                           **JOHSON TRENT WEST & TAYLOR LLP**


                                   By:     /s/ Lori D. Proctor
                                           Lori D. Proctor, Esq.
                                           New Mexico Federal Bar ID# 11-93
                                           919 Milam Street, Suite 1700
                                           Houston, T.X.  77002
                                           Telephone: 713.222.2323
                                           Facsimile: 713.222.2226
                                           lproctor@proctor-law.com

                                           *Counsel for Plaintiffs THI of New Mexico at Hobbs*
                                           *Center, LLC and THI of New Mexico, LLC*

# Exhibit A

# ADMISSION CONTRACT
## New Mexico

This Admission Contract ("Contract") is executed as of _8/31_, 20_06_ by and among _HOBBS HEALTH CARE_, a corporation located at _5715 N LOVINGTON HWY_, _HOBBS_, _NM_ _88240_ (the "Health Care Center"), and _DOUG SPRADLIN_ ("Patient/Resident"), and/or _MELISSA HARDY_ ("Fiduciary Party"), if any.

**IN CONSIDERATION OF THE MUTUAL PROMISES CONTAINED IN THIS CONTRACT, THE PARTIES AGREE AS FOLLOWS:**

### I. GENERAL PROVISIONS

1. <u>Term</u>. Patient/Resident agrees to reside in the Health Care Center. This Contract shall remain in effect until terminated by Patient/Resident in accordance with applicable law or terminated by the Health Care Center as provided in Article IV.

2. <u>Fiduciary Parties</u>. Fiduciary Party shall act on behalf of Patient/Resident for all purposes permitted under applicable law. Fiduciary Party shall pay fees and charges incurred hereunder by or on behalf of Patient/Resident from Patient's/Resident's assets or estate. Fiduciary Party may act in more than one capacity and shall be bound by the applicable terms and conditions of this Contract. Except as otherwise expressly provided to the contrary herein, if Fiduciary Party uses due care, Fiduciary Party will not become personally liable for the payment of Patient's/Resident's fees and charges by signing this Agreement. Patient/Resident acknowledges and consents to the execution of this Contract by Fiduciary Party.

### II. FEES, PAYMENTS and SERVICES

1. <u>Charges and Fees</u>

   A. <u>Itemized Charges</u>. The parties acknowledge that a copy of an itemized list of charges for all services and products, including the basic daily rate, was provided to Patient/Resident when this Contract was executed.

   B. <u>Late Payment Fee</u>. The Health Care Center may charge Patient/Resident a late payment fee or interest at a rate equal to the lesser of (a) Eighteen percent (18%) per annum (18%) or, if lesser, the highest percentage allowed by law, on all charges (exclusive of interest) for which Patient/Resident is liable that are outstanding for more than 30 days from the date on which the Patient/Resident was billed for said charges or (b) the amount set forth in any Contract Addendum.

Page 1 of 6

C. Fees for Collecting Outstanding Bills. The Health Care Center shall be entitled to all costs of collection, including court costs and reasonable attorney's fees reasonably incurred to collect fees and charges not paid when due, to the fullest extent permitted by applicable law. To the extent permitted by applicable law, in disputes arising from this Contract, the prevailing party shall be entitled to attorney's fees.

D. Refunds. On termination of this Contract, if any fees or charges have been prepaid, any excess shall be refunded to Patient/Resident or authorized representative in accordance with applicable law. All periodic fees due shall be prorated to the date of termination.

E. Changes in Charges and Fees. Charges and fees for services and products provided by the Health Care Center may be changed from time to time. Services and products may also be curtailed or eliminated completely, as permitted by applicable law. The Health Care Center shall notify Patient/Resident and any other party liable for charges and fees in accordance with applicable law.

2. Payment. The Patient's/Resident's responsibility to pay for his or her care at the Health Care Center is described in the Contract Addendum, which is incorporated herein by reference. Patient's/Resident's responsibility for payment may change if the third party payor responsible for the payment of Patient's/Resident's charges changes. Patient/Resident shall execute a new Contract Addendum describing his or her new responsibilities for payment whenever his or her third party payor changes.

3. Medicare/Medicaid Certification.

    (a)    The Health Care Center _____(is)_____ is not certified by the Medicare Program to accept Medicare patients.

    (b)    The Health Care Center _____(is)_____ is not certified by the Medicaid Program to accept Medicaid patients.

## III. PATIENT'S/RESIDENT'S RESPONSIBILITY AND AUTHORIZATIONS

1. Patient/Resident Responsibilities. Patient/Resident shall abide by the reasonable policies and rules of the Health Care Center, which are included herein by reference.

2. Responsibility for Personal Items. Patient/Resident shall provide all items for his or her personal use, including, but not limited to, daytime clothing, personal items, and other items as listed in the Health Care Center's policies and rules. Patient/Resident shall be permitted to use personal possessions to the extent possible without interference upon the rights, health or safety of others. The Health Care Center shall not be liable for Patient's/Resident's clothing or personal items, except to the extent required by applicable law.

Page 2 of 6

3.   <u>Living Quarters</u>.   Health Care Center shall initially place the Patient/Resident in accommodations that, in the opinion of the Health Care Center, will result in a compatible Patient/Resident relationship and/or appropriate and efficient care by the Health Care Center. However, the Health Care Center reserves the right to transfer Patient/Resident to other living quarters if required or permitted by law or for efficient management (to the extent permitted by applicable law and the Health Care Center's polices) and will notify Patient/Resident, in accordance with applicable law.

4.   <u>Request for Admission and Treatment</u>.   By executing this Contract, Patient/Resident represents that Patient's/Resident's condition is such that Patient/Resident requires the care and treatment services provided by the Health Care Center and is requesting admission to the Health Care Center of his or her own free will for purposes of receiving the care and treatment services normally provided by the Health Care Center for his or her level of care, including, but not limited to:

   (a)   nursing services;
   (b)   dietary services;
   (c)   activities program services;
   (d)   room/bed maintenance services;
   (e)   routine personal hygiene services;
   (f)   medically related social services; and
   (g)   medical care services recommended by his or her physician.

By executing this Contract, Patient/Resident authorizes the Health Care Center and the Patient's/Resident's physician or physician's designee to administer the above described care and treatment services. Patient/Resident acknowledges that no warranty or guarantee has been made by the Health Care Center concerning Patient's/Resident's condition or any changes related thereto.

5.   <u>Medical Services and Equipment</u>.   Except as specified in the Contract Addendum, Patient/Resident shall be financially responsible for all medical and other services, equipment and supplies necessary for Patient's/Resident's personal use.   Patient/Resident hereby authorizes the Health Care Center to bill Medicare Part B or any other applicable payor for equipment, supplies and services furnished directly by the Health Care Center or by others to Patient/Resident.

Patient/Resident hereby assigns to the Health Care Center his or her right to reimbursement for any services rendered to Patient/Resident and authorizes the Health Care Center to receive payments for such services pursuant to this assignment. Patient/Resident is not required to purchase any item or service as a condition of admission or continued stay in the Health Care Center.

Page 3 of 6

6.  **Emergency Medical Treatment.** Health Care Center is hereby authorized to provide or arrange for any emergency medical treatment deemed necessary for Patient/Resident or to arrange for the Patient's/Resident's transfer to a hospital or other facility for such purposes.

## IV. TERMINATION OR MODIFICATION OF CONTRACT

1.  **Change in Patient's/Resident's Health.** If the physical or mental condition of Patient/Resident changes such that Patient/Resident requires a higher level of care and the Health Care Center determines that it cannot provide appropriate care, Patient/Resident will be transferred, in accordance with applicable law, to another facility for appropriate care and this Contract shall terminate unless accommodations are reserved as provided in the Contract Addendum. If Patient/Resident passes away, this Contract shall terminate on the day of Patient's/Resident's death.

2.  **Involuntary Transfer or Discharge.** The Health Care Center reserves the right to involuntarily transfer or discharge Patient/Resident, in accordance with applicable law, following written notice and transfer or discharge planning. This Contract shall terminate on the date of involuntary transfer or discharge. Except in an emergency or other circumstance permitted by law, a Patient/Resident normally will be provided with at least thirty (30) days advance written notice of discharge or involuntary transfer within the Health Care Center.

## V. REPRESENTATIONS, INTERPRETATIONS AND COMPLETENESS

1.  **Patient/Resident Representations.** Admission of the Patient/Resident is based on the representations contained in the admission documents. The Patient/Resident and Fiduciary Party represent that the statements made in all admissions documents are true, correct and complete without omissions of any material facts. Furthermore, the Patient/Resident and Fiduciary Party shall promptly inform the Health Care Center in writing of any changes in the statements included in all admission documents.

2.  **Acknowledgement of Patient's/Resident's Financial Responsibility.** While the Health Care Center may assist in the procurement of third-party payor coverage, including Medicaid, Medicare and other insurance coverage, for the cost of residency and treatments, the Patient/Resident and his or her legal representative acknowledge that the Health Care Center does not guarantee coverage or the amount of payment by any payor source. The Patient/Resident acknowledges that assistance by the Health Care Center does not alter his or her responsibility to satisfy debts incurred for services rendered.

3.  **Health Care Center Representations.** The Health Care Center utilizes reasonable efforts to provide all goods and services to Patient/Resident in accordance with applicable law and the representations contained herein. However, because the provision of health care services is a personalized service requiring interventions on many occasions by many persons,

Page 4 of 6

Patient/Resident acknowledges that the standards and/or representations will not be satisfied from time to time.

4.  Interpretation of Provisions. Wherever possible, each provision of this Contract shall be interpreted in such manner to be effective under applicable law. If at any time any provision of this Contract shall be prohibited by or invalid under applicable law, such provision shall be severed from the Contract and the remaining provisions of this Contract shall be unaffected.

5.  Complete Agreement. This Contract, the Contract Addendum(s), and the documents listed on the Acknowledgement page attached to this Contract and made a part hereof constitute the entire contract between the parties. This Contract may not be amended except in writing executed by the parties or their successors.

## VI. ARBITRATION

Pursuant to the Federal Arbitration Act, any action, dispute, claim, or controversy of any kind (e.g., whether in contract or in tort, statutory or common law, legal or equitable, or otherwise) now existing or hereafter arising between the parties in any way arising out of, pertaining to or in connection with the provision of healthcare services, any agreement between the parties, the provision of any other goods or services by the Health Care Center or other transactions, contracts or agreements of any kind whatsoever, any past, present or future incidents, omissions, acts, errors, practices, or occurrence causing injury to either party whereby the other party or its agents, employees or representatives may be liable, in whole or in part, or any other aspect of the past, present, or future relationships between the parties shall be resolved by binding arbitration administered by the National Health Lawyers Association (the "NHLA").

**THE UNDERSIGNED ACKNOWLEDGE THAT EACH OF THEM HAS READ AND UNDERSTOOD THIS CONTRACT, AND THAT EACH OF THEM VOLUNTARILY CONSENTS TO ALL OF ITS TERMS**

_____          _DOUG SPRADLIN_____
Patient/Resident                            Printed Name

Date: _08/31/04_____                  _110 E CORBETT APT 12_
                                            Address
                                            _P.O. Box 5013_____
                                            _HOBBS, NM 88240_____

11/17/2010   11:14   5753928676                    HOBBS HEALTHCARE                    PAGE  02

**AND/OR**

_Melissa Hardy_ (signature)                 MELISSA HARDY
Fiduciary Party (if any)                    Printed Name

Fiduciary Party executes this Contract in the capacity(y)(ies) checked below and shall provide evidence of Fiduciary Party's capacity(y)(ies) at the time of signing this Contract.

☐ Guardian appointed by court. Includes:
  ☐ Guardian of the person for purposes of admitting Patient/Resident to the Health Care Center, or
  ☐ Guardian of property for purposes of handling Patient's/Resident's finances, or
  ☐ Both
☐ Attorney-In-Fact under validly executed power of attorney
☐ Conservator of the estate approved by court
☐ Trustee under written trust agreement
☐ Personal Representative designated in writing by Patient/Resident to exercise rights protected under the Social Security Act and other purposes permitted by law
☐ Legal Representative, as defined in rules and regulations implementing the Omnibus Reconciliation Act of 1987 (OBRA), amending 42 U.S.C. § 1395, et. seq., having legal access to Patient's/Resident's income or resources
☐ Representative Payee within the meaning of the Social Security Act who receives Social Security benefits for and on behalf of Patient/Resident
☒ Immediate Family Member

_08/31/06_                          7520 Casa Bonita
Date                                _1500 N. Grimes_
                                    Address
                                    P. O. Box 233
                                    HOBBS, NM 88240

By: _Janice A. Fagan_ (signature)        JANICE A. FAGAN
    Health Care Center Representative     Printed Name

_08/31/06_
Date

White – Patient/Resident     Canary – Business Office

6/00

# Exhibit B

Page 1 of 3

# DURABLE POWER OF ATTORNEY
## FOR FINANCIAL AND HEALTHCARE DECISION MAKING

I, _DOUG SPRADLIN_ Resident in _LEA_ County, New Mexico.
I hereby appoint my _DAUGHTER & SON_ _MELISSA HARDY_ _& JAY STRADLIN_ to serve

as my attorney-in-fact. If _____ is unable or unwilling to serve,

then I name my _____ , _____ to serve as

My successor attorney-in-fact.

> Check and initial the following paragraph only if more than one person is appointed to act on your behalf and you want any one of them to have the power to act alone without the signature of the other(s). If you do not check and initial the following paragraph and more than one person is named to act on your behalf, then they must act jointly.
>
> ✓ _D. R. S_ If more than one person is appointed to serve as my Decision-maker, then each may act alone and independently of each other.

My attorney(s)-in-fact shall have the power to act in my name, place and stead in any way which I myself could do with respect to all matters to the extent permitted by law, including, by way of example and not by way of limitation:

### Initial the line opposite each authorization that you desire to give to decision-maker.

_____  1. Real estate transactions including the sale or transfer of my interest in the real property located at _____

_D.S._  2. Stock and bond transactions;

_D.S._  3. Commodity and option transactions;

_D.S._  4. Tangible personal property transactions;

_D.S._  5. Banking and other financial institution transaction;

_D.S._  6. Business operating transactions;

_D.S._  7. Insurance and annuity transaction;

Page 2 of 3



8. Estate, trust and other beneficiary transactions;

9. Claims and litigation;

10. Personal and family maintenance;

11. Benefits from Social Security, Medicare, Medicaid or other government programs.

12. Records, reports and statements.

13. Retirement plan transactions;

14. Tax matters, including any transactions with the Internal Revenue Service;

15. Decisions regarding lifesaving and life prolonging medical treatment;

16. Decisions relating to medical treatment, surgical treatment, nursing care, medication, hospitalization, institutionalization, in a nursing home or other facility and home health care;

17. Transfer of property or income as a gift to the principal's spouse for the purpose of qualifying the principal for governmental medical assistance;

18. Transfer of property or income to a trust established for the principal's benefit, as permitted by law, for the purpose of qualifying the principal for governmental assistance.

**This power of attorney shall become effective only if I become incapacitated.** My attorney(s)-in-fact shall be entitled to rely on notarized statements from two qualified health care professionals as to my incapacity. By incapacity, I mean that among other things, I am unable to effectively arrange my personal care, property, or financial affairs. I intend by this power of attorney to avoid a court-supervised guardianship or conservatorship. Should by attempt be defeated, I ask that my attorney-in-fact be appointed as guardian or conservator of my person or estate.

**This power of attorney is effective immediately** and shall not be affected by my incapacity or lapse of time, but will terminate upon my death unless I have revoked it prior to my death. I intend by this power of attorney to avoid a court-supervised guardianship or conservatorship. Should my attempt be defeated, I ask that my agent be appointed as guardian or conservator of my person or estate.

Page 3 of 3

GIVING AND GRANTING unto my said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises as fully, with the same force and effect, and to all intents and purposes, as I might or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that my said attorney or his/her substitute shall lawfully do or cause to be done by virtue hereof.

I hereby revoke all previous powers of attorney executed by me.

X. _Douglas A Spradlin Jr_        Date _8-31-06_
Name

### ACKNOWLEDGMENT

STATE OF _New Mexico_

_LEA_
(County)

Subscribed and sworn to before me on _August 31, 2006_ by

_Douglas A Spradlin, Jr._        _Janice C. Gygn_
                                   Notary Public

My Commission Expires _8/26/2010_

# Exhibit C

ENDORSED
First Judicial District Court

JUN 2 9 2011

Santa Fe, Rio Arriba &
Los Alamos Counties
PO Box 2268
Santa Fe, NM 87504-2268

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

JASON SPRADLIN, AS PERSONAL
REPRESENTATIVE OF THE WRONGFUL
DEATH ESTATE OF DOUGLAS A. SPRADLIN, JR.,
DECEASED,

                    Plaintiff,

vs.                                             NO. D0101-CV-2011-2107

THI OF NEW MEXICO AT HOBBS CENTER,
L.L.C., THI OF NEW MEXICO, L.L.C.,
THI OF BALTIMORE, INC., FUNDAMENTAL
LONG TERM CARE HOLDINGS, L.L.C.,
TRANS HEALTHCARE, INC.,
MURRAY FORMAN, LEONARD GRUNSTEIN,
ERIC MCLEMORE, DAVID STROUD,
AND DOES 1-250,

                    Defendants,

### COMPLAINT FOR WRONGFUL DEATH, NEGLIGENCE, NEGLIGENCE PER SE, MISREPRESENTATION, VIOLATION OF THE UNFAIR TRADE PRACTICES ACT AND PUNITIVE DAMAGES

COMES NOW, Jason Spradlin, as Personal Representative for the Wrongful

Death Beneficiaries of Douglas A. Spradlin, Jr., deceased, by and through his attorneys,

Wilkes & McHugh, P.A. and for the causes of action against Defendants, and each of

them, states and alleges as follows:

### PARTIES

1.       Douglas A. Spradlin, Jr. was a resident at the nursing home known as Hobbs

Healthcare Center located in Lea County at 5715 Lovington Highway, Hobbs, New

Mexico 88240 from on our about August 31, 2006 to March 6, 2009, just five days before

his death.

2.     Jason Spradlin brings this suit in his capacity as a personal representative of the wrongful death beneficiaries of his father, Douglas A. Spradlin, Jr., deceased.

3.     Jason Spradlin was appointed personal representative by the Fifth Judicial District Court on October 21, 2010, and files herewith a copy of the Order for Appointment of Personal Representative to Pursue Wrongful Death Claim, attached as Exhibit 1.

4.     At all relevant times, Defendants THI OF NEW MEXICO AT HOBBS CENTER, L.L.C. a Delaware limited liability company, and JOHN DOES 1 through 50 were licensed and doing business as (dba) HOBBS HEALTHCARE CENTER in Hobbs, New Mexico, Lea County (hereinafter the "NURSING HOME").

5.     At all relevant times, Defendants THI OF NEW MEXICO, L.L.C., THI OF BALTIMORE, INC., FUNDAMENTAL LONG TERM CARE HOLDINGS, L.L.C., TRANS HEALTHCARE, INC., MURRAY FORMAN, LEONARD GRUNSTEIN and JOHN DOES 50 through 100 (hereinafter collectively referred to as "NURSING HOME MANAGEMENT DEFENDANTS") owned, operated, and/or managed the NURSING HOME, and furthermore participated in, authorized, and/or directed the conduct of the NURSING HOME and its respective agents and employees.

6.     At all relevant times, the NURSING HOME was in the business of providing long-term care as a 24-hour nursing facility and as such was subject to the requirements of all corresponding statutes and regulations that govern the operation of a 24-hour nursing facility. (Hereinafter all references to the "DEFENDANTS" are in reference to the NURSING HOME, NURSING HOME MANAGEMENT DEFENDANTS, ERIC MCLEMORE, DAVID STROUD and JOHN DOES 1 through 250.)

7.     JOHN DOES 121 through 250 are those persons and/or entities whose conduct caused the injuries alleged herein to Douglas A. Spradlin, Jr.

8.     JOHN DOES 1 through 250 are persons and/or entities whose relationships to the named Defendants, or whose acts or omissions, give rise to legal responsibility for the

2

damages incurred by Douglas A. Spradlin, Jr., but whose true identities, at the present time, are unknown to Plaintiff. These persons are hereby notified of Plaintiff's intention to join them as defendants, if and when, additional investigation or discovery reveals the appropriateness of such joinder.

9.     THI of New Mexico at Hobbs Center, L.L.C., is a Delaware limited liability company engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including the NURSING HOME, at all times material to this lawsuit.  The causes of action made the basis of this suit arise out of such business conducted by said Defendant in the ownership, operation, management and/or control of the NURSING HOME.  Defendant THI of New Mexico at Hobbs Center, L.L.C may be served with process by serving its registered agent National Corporation Research, LTD., 1012 Marquez Place, Suite 106B, Santa Fe, New Mexico, 87505.

10.    THI OF NEW MEXICO, L.L.C., is a Delaware limited liability company engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including the NURSING HOME, at all times material to this lawsuit.  The causes of action made the basis of this suit arise out of such business conducted by said Defendant in the ownership, operation, management and/or control of the NURSING HOME.  Defendant THI OF NEW MEXICO, L.L.C., may be served with process by serving its registered agent National Corporation Research, LTD., 1012 Marquez Place, Suite 106B, Santa Fe, New Mexico, 87505.

11.    THI of Baltimore, Inc. is a Delaware corporation engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including the NURSING HOME, at all times material to this lawsuit.  The causes of action made the basis of this suit arise out of such business conducted by said Defendant in the ownership, operation, management and/or control of the NURSING HOME.  Defendant THI of Baltimore, Inc. may be served with process by serving its

registered agent National Corporation Research, LTD., 836 Park Avenue, Second Floor, Baltimore, MD, 21201.

12.     Fundamental Long Term Care Holdings, L.L.C. is a Delaware limited liability company engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including the NURSING HOME, at all times material to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by said Defendant in the ownership, operation, management and/or control of the NURSING HOME. Defendant Fundamental Long Term Care Holdings, L.L.C. may be served with process by serving its registered agent National Corporate Research, 520 South 2nd Street, #403, Springfield, IL, 62701.

13.     Trans Healthcare, Inc. is a Delaware corporation engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including the NURSING HOME, at all times material to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by said Defendant in the ownership, operation, management and/or control of the NURSING HOME. Defendant Trans Healthcare, Inc may be served with process by serving its registered agent National Corporation Research, LTD., 836 Park Avenue, Second Floor, Baltimore, MD, 21201.

14.     Murray Forman is engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including the NURSING HOME, at all times material to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by said Defendant in the ownership, operation, management and/or control of the NURSING HOME. Defendant Murray Forman may be served with process by serving him at his place of business at 405 Lexington Avenue, 10th floor, New York, New York, 10174.

15.     Leonard Grunstein is engaged in the business of owning, operating, managing and/or maintaining nursing homes and related healthcare facilities including the NURSING HOME, at all times material to this lawsuit. The causes of action made the

4

basis of this suit arise out of such business conducted by said Defendant in the ownership, operation, management and/or control of the NURSING HOME. Defendant Leonard Grunstein may be served with process by serving him at his place of business at 405 Lexington Avenue, 10th floor, New York, New York, 10174.     .

16.     Defendants Eric McLemore, David Stroud and John Does 111 through 120 were licensed as Nursing Home Administrators in the State of New Mexico.   During all relevant times they were employed as the Administrators of the NURSING HOME.

## DIRECT AND VICARIOUS LIABILITY

17.     At all relevant times, the NURSING HOME and the NURSING HOME MANAGEMENT DEFENDANTS owned, operated, and/or managed the NURSING HOME, and furthermore participated in, authorized, and/or directed the conduct of the NURSING HOME and its respective agents and employees. As such, the NURSING HOME and the DEFENDANTS are directly liable for their own negligence, recklessness and other tortious conduct, in the hiring and management of their agents and employees, as is more fully alleged herein.

18.     At all relevant times, the NURSING HOME and the NURSING HOME MANAGEMENT DEFENDANTS provided management services to the NURSING HOME, which governed and controlled the nursing care and custodial services provided to Douglas A. Spradlin, Jr., and that by virtue of their management and control over the NURSING HOME, the NURSING HOME and the NURSING HOME MANAGEMENT DEFENDANTS voluntarily and intentionally assumed responsibility for and provided supervisory services for the nursing care and custodial services provided to Douglas A. Spradlin, Jr. while he was a resident at the NURSING HOME.

19.     That the NURSING HOME and the NURSING HOME MANAGEMENT DEFENDANTS through their managers, directors, presidents, vice-presidents, executive officers, and other agents, directly oversaw, managed, and/or controlled all aspects of the operation and management of the NURSING HOME, including, but not limited to, the budget of the NURSING HOME, the staffing of the NURSING HOME, staff training,

the NURSING HOME'S policy and procedures manual(s), the licensing of the NURSING HOME, accounts payable, accounts receivable, NURSING HOME development and leasing, general accounting, cash management, pricing, reimbursement, capitalization, and profit and loss margins.

20.     That the NURSING HOME and the NURSING HOME MANAGEMENT DEFENDANTS, through their managers, directors, presidents, vice-presidents, executive officers, and other agents created budgets, policies and procedures that the NURSING HOME employees were required to implement and follow.

21.     That the NURSING HOME and the NURSING HOME MANAGEMENT DEFENDANTS employed all of those persons who attended to and provided care to Douglas A. Spradlin, Jr. while he was a resident at the NURSING HOME, and employed those persons in management and supervisory positions who directed the operations of the NURSING HOME, all of whom were acting within the course and scope of their employment, during Douglas A. Spradlin, Jr.'s residency.

22.     That the NURSING HOME and the NURSING HOME MANAGEMENT DEFENDANTS, through their administrators, directors and managing agents, complied with and ratified all conduct of the NURSING HOME alleged herein.

23.     That at all relevant times, the DEFENDANTS were the knowing agents and/or alter-egos of one another, inclusive, and that the DEFENDANTS' officers, directors, and managing agents, directed, approved, and/or ratified the conduct of each of the other DEFENDANTS' officers, agents and employees, and are therefore vicariously liable for the acts and/or omissions of their co-defendants, their agents and employees, as is more fully herein alleged.  Moreover, at all relevant times, all DEFENDANTS were acting within the course and scope of their employment.

24.     The DEFENDANTS' tortious acts and omissions, as alleged herein, were done in concert with each other and pursuant to a common design and agreement to accomplish a particular result, namely maximizing profits by operating the NURSING HOME in such a manner that the NURSING HOME was underfunded and understaffed.  Moreover, the

NURSING HOME aided and abetted each other in accomplishing the acts and omissions alleged herein. (*See* Restatement (Second) of Torts § 876 (1979)).

25.   The DEFENDANTS, by their acts and omissions as alleged herein, operated pursuant to an agreement, with a common purpose and community of interest, with an equal right of control, and subject to participation in profits and losses, as further alleged herein, such that they operated a joint enterprise or joint venture, subjecting each of them to liability for the acts and omissions of each other.

## VENUE/JURISDICTION

26.   Venue and jurisdiction are appropriate in Santa Fe County, New Mexico pursuant to NMSA §38-3-1.

## FACTUAL SUMMARY/PLAINTIFF'S INJURIES

27.   On approximately August 31, 2006, Douglas A. Spradlin, Jr. was admitted as a resident to the NURSING HOME and placed under the care of the DEFENDANTS and their employees. He remained a resident at the NURSING HOME until March 6, 2009.

28.   During his residency at the NURSING HOME, Defendants knew that Douglas A. Spradlin, Jr. was in a compromised state because he suffered from dementia and chronic obstructive pulmonary disease.

29.   As a result of Douglas A. Spradlin, Jr.'s condition, he required supervision, close monitoring, and medical attention to ensure his health, safety and well-being.

30.   Defendants knew that by virtue of his physical and mental state, Douglas A. Spradlin, Jr. was dependent upon them for nursing and other health care services.

31.   Defendants also knew that by virtue of Douglas A. Spradlin, Jr.'s physical and mental state that he was dependent upon them for his activities of daily living including, but not limited to, feeding and dietary planning, skin care, hygiene, infection control/prevention, toileting, and physical rehabilitation/exercise. Furthermore, Defendants knew that Mr. Spradlin was susceptible to infections and was at risk for developing pressure sores because of his limited mobility.

32.   Despite Defendants' knowledge and awareness of Douglas A. Spradlin, Jr.'s

needs, during his residency at the NURSING HOME, Douglas A. Spradlin, Jr. did not receive the attention and care necessary to prevent the development and worsening of pressure sores and to prevent him from developing infections.

33.   Mr. Spradlin in fact developed pressure sores as a result of the Defendants' inattention and lack of necessary care to prevent the development of pressure sores.

34.   Despite Defendants' knowledge of Mr. Spradlin's risk for skin breakdown, they nevertheless failed to properly assess, monitor and prevent the development of his pressure ulcers.

35.   As a result of Defendants' inattention and lack of necessary care, Mr. Spradlin in fact developed infections and resulting injuries.

36.   Douglas A. Spradlin, Jr. needed assistance with eating and dietary planning, which was known to Defendants. Defendants' failure to provide this assistance put Mr. Spradlin at risk for malnutrition, weight loss and dehydration, which was known to the Defendants and which he in fact suffered.

37.   During his residency, the DEFENDANTS knew that Douglas A. Spradlin, Jr. was prone to falls and vulnerable to injuries. In fact, DEFENDANTS or their employees had assessed Mr. Spradlin as being at high risk for falls as a result of his cognitive impairment and unsteady gait.

38.   Despite the DEFENDANTS' knowledge and awareness of Douglas A. Spradlin, Jr. needs, Douglas A. Spradlin, Jr. did not receive the attention and care necessary to prevent him from falling at the NURSING HOME on multiple occasions and suffering injuries, including, but not limited to, a right hip fracture.

39.   Douglas A. Spradlin, Jr.'s injuries were entirely preventable had Defendants simply provided their respective facilities with sufficient staff, in number and training, to provide him with the amount of care that laws and regulations required.

40.   Douglas A. Spradlin, Jr.'s injuries, including death, would not have occurred but for the complete willful disregard by Defendants of their duties owed to Douglas A. Spradlin, Jr.

41.     Douglas A. Spradlin, Jr. was subjected to pain and suffering and he eventually died as a result of the inadequate care and treatment he suffered at the hands of the Defendants.

## CAUSES OF ACTION

### COUNT 1
### WRONGFUL DEATH AGAINST THE DEFENDANTS

42.     All allegations set forth above in paragraphs 1 through 41 are incorporated by reference as if fully set forth herein.

43.     The acts and omissions of the DEFENDANTS, and each of them, individually and through their agents and employees, were wrongful and negligent and were the proximate cause of Douglas A. Spradlin, Jr.'s death.

44.     Plaintiffs are entitled to recover all damages legally available under the New Mexico Wrongful Death Act, NMSA § 41-2-1, including the loss of enjoyment of life, the monetary worth of his extreme pain and extreme suffering, the reasonable expenses of necessary medical care and treatment and of funeral and burial, together with all other damages that are fair and just.

45.     The actions of the DEFENDANTS, individually and through their agents or employees, were malicious, willful, reckless, and/or done with wanton disregard for Mr. Spradlin, giving rise to punitive damages against these Defendants.

### COUNT II
### NEGLIGENCE AGAINST ALL DEFENDANTS

46.     All allegations set forth above in paragraphs 1 through 45 are incorporated by reference as if fully set forth herein.

47.     Defendants owed a duty to their residents, including Mr. Spradlin, to provide care treatment, and services within accepted standards of care.

48.     Defendants owed a duty to their residents, including Mr. Spradlin, to hire, train and supervise employees to deliver care and services to residents in a sage and beneficial manner.

49.   Defendants breached the duty owed their residents, including Mr. Spradlin, and were negligent in their care and treatment of Mr. Spradlin, through their acts or omissions, which include, but are not limited to, the following:

a.   Failure to adequately assess, evaluate and supervise nursing personnel so as to ensure that Mr. Spradlin received appropriate nursing care, in accordance with Defendants' policies and procedures, state and federal laws and regulations;

b.   Failure to provide Mr. Spradlin with basic and necessary care and supervision;

c.   Failure to protect Mr. Spradlin from abuse and neglect;

d.   Failure to treat Mr. Spradlin with kindness and respect.

e.   Failure to properly notify Mr. Spradlin's family and/or physician of significant changes in his health status;

f.   Making false, misleading and deceptive representations as to the quality of care, treatment, and services provided by Defendants to their residents, including Mr. Spradlin;

g.   The failure to adopt adequate guidelines, policies, and procedures for documenting, maintaining files, investigating, and responding to any complaint regarding the quantity of resident care, the quality of patient or resident care, or misconduct by all Defendants' employees, irrespective of whether such complaint derived from a state or federal survey agency, a resident of said facilities, an employee of said facilities or any interested person;

h.   Failure of high managerial agents and corporate officers to adequately hire, train, supervise, and retain the administrator and director of nurses so as to assure that Mr. Spradlin received care in accordance with the Defendants' policies and procedures, state and federal laws and regulations;

i.   Failure to adequately hire, train, supervise and retain a sufficient amount of competent and qualified registered nurses, licensed vocational nurses, nurses assistants and other personnel in their respective facilities to assure that Mr. Spradlin received care, treatment, and services in accordance with Defendants' policies and procedures, state and federal law and regulations;

j.  The failure to increase the number of nursing staff at their respective facilities to ensure that Mr. Spradlin:

    i.  received timely and accurate care assessments;

    ii.  received prescribed treatment, medication, and diet;

    iii.  received necessary supervision; and

    iv.  received timely nursing and medical intervention due to a significant change in condition.

k.  The failure to provide nursing personnel sufficient in number to provide proper treatment and assessment to Mr. Spradlin and other residents, to protect Mr. Spradlin's skin integrity and to prevent pressure sores and the infection of pressure sores.

l.  The failure to provide nursing staff sufficient in number to ensure that Mr. Spradlin attained and maintained his highest level of physical, mental and psychosocial well being;

m.  The failure to provide adequate supervision to the nursing staff so as to ensure that Mr. Spradlin received adequate and proper nutrition, therapeutic diet, sanitary care treatments, skin care and sufficient nursing observation and examination of the responses, symptoms, and progress in the physical condition of Mr. Spradlin.

n.  The failure to maintain medical records on Mr. Spradlin in accordance with accepted professional standards and practices that are complete, accurately documented, readily accessible and systematically organized with respect to:

    i.  The diagnosis of Mr. Spradlin

    ii.  The treatment of Mr. Spradlin

    iii.  The assessment and establishment of appropriate care plans of care and treatment for Mr. Spradlin;

o.  The failure by the members of the governing body of the NURSING HOME to discharge its legal and lawful obligation by:

    i.  Ensuring that the rules and regulations designed to protect the health and safety of the residents, such as Mr. Spradlin, as promulgated in the New Mexico Nursing Home Residents Rights Act 7.9.2.22 NMAC (2005), by the New Mexico Health Facility Licensing and Certification Bureau, state and federal laws and regulations, were consistently complied with on an ongoing basis;

    ii.  Ensuring that the resident care policy for the NURSING HOME were consistently complied with on an ongoing basis, and;

    iii.  Responsibly ensuring that appropriate corrective measures were

implemented to correct problems concerning inadequate resident care;

p. The failure to take reasonable steps to prevent, eliminate and correct the deficiencies and problems in resident care.

50. Mr. Spradlin's care was under the exclusive control and management of Defendants.

51. Mr. Spradlin's injuries were of a kind which does not ordinarily occur in the absence of negligence on Defendants' part.

52. The injuries and wrongful death of Mr. Spradlin are a proximate result of the acts or omissions set forth above, singularly or in combination.

## COUNT III
## NEGLIGENCE PER SE AGAINST THE DEFENDANTS

53. All allegations set forth above in paragraphs 1 through 52 are incorporated by reference as if fully set forth herein.

54. At all relevant times, the DEFENDANTS were engaged in the business of operating a long-term health care facility in Hobbs, New Mexico, and were subject to state and federal laws and regulations regarding long-term care facilities and nursing homes.

55. In its treatment of Mr. Spradlin, the DEFENDANTS violated state and federal laws and regulations, which set forth not the ordinary standard of care, but the minimum standards, including, but not limited to, the following, which required DEFENDANTS to:

a. "care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident" 42 USC § 1395i-3(b)(1)(A) and 42 USC § 1396r-(b)(1)(A);

b. "provide services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, in accordance with a written plan of care" 42 USC § 1395i-3(b)(2) and 42 USC §1396r-(b)(2);

12

c.      "conduct a comprehensive, accurate, standardized, reproducible assessment of each resident's functional capacity" " 42 USC § 1395i-3(b)(3) and 42 USC §1396r-(b)(3);

d.      provide "nursing services and specialized rehabilitative services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident" 42 USC § 1395i-3(b)(4)(A)(i) and 42 USC §1396r-(b)(4)(A)(i);

e.      provide "medically-related social services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident" 42 USC § 1395i-3(b)(4)(A)(ii) and 42 USC §1396r-(b)(4)(A)(ii);

f.      provide "pharmaceutical services (including procedures that assure the accurate acquiring, receiving, dispensing, and administering of all drugs and biologicals) to meet the needs of each resident" 42 USC § 1395i-3(b)(4)(A)(iii) and 42 USC §1396r-(b)(4)(A)(iii);

g.      provide "dietary services that assure that the meals meet the daily nutritional and special dietary needs of each resident" 42 USC § 1395i-3(h)(4)(A)(iv) and 42 USC §1396r-(b)(4)(A)(iv);

h.      provide "an on-going program, directed by a qualified professional, of activities designed to meet the interests and the physical, mental, and psychosocial well-being of each resident" 42 USC § 1395i-3(b)(4)(A)(v) and 42 USC §1396r-(b)(4)(A)(v);

i.      provide "24-hour licensed nursing service...sufficient to meet nursing needs of its residents" 42 USC § 1395i-3(b)(4)(C)(i) and 42 USC §1396r-(b)(4)(C)(i)(I);

j.      protect and promote the rights of each resident" 42 USC § 1395i-3(c)(1)(A) and 42 USC §1396r-(c)(1)(A);

k.      "right to voice grievances with respect to treatment or care that is (or fails to be) furnished, without discrimination or reprisal for voicing the grievances and the right to prompt efforts by the facility to resolve grievances the resident may have" 42 USC § 1395i-3(c)(1)(A)(vi) and 42 USC §1396r-(c)(1)(A)(vi);

l.      "establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment in which residents reside and to help prevent the development and transmission of disease and infection" 42 USC § 1395i-3(d)(3)(A) and 42 USC §1396r-(d)(3)(A);

m.  "operate and provide services in compliance with all applicable Federal, State and local laws and regulations...and with accepted professional standards and principles which apply to professionals providing services in such a facility" 42 USC § 1395i-3(d)(4)(A) and 42 USC §1396r-(d)(4)(A);

n.  not abuse or allow abuse or harm to come to its residents, pursuant to NMSA 1978 §30-47-4, which criminalizes conduct constituting "abuse" of a resident in a care facility. "Abuse" is "any act or failure to act performed intentionally, knowingly, or recklessly that causes or is likely to cause harm to a resident, including...medically inappropriate conduct that causes or is likely to cause physical harm to a resident." NMSA 1978 §30-47-3(A)(4).

o.  Not to neglect its residents pursuant to NMSA 1978 §30-47-5, which criminalizes conduct constituting "neglect" of a resident in a care facility. "Neglect includes any grossly negligent:

    i.  "failure to provide any treatment, service, care, medication or items that is necessary to maintain the health or safety of a resident," NMSA 1978 §30-47-3(F)(1);

    ii.  "failure to take any reasonable precaution that is necessary to prevent damage to the health or safety of a resident," NMSA 1978 §30-47-3(F)(2);

    iii.  "failure to carry out a duty to supervise properly or control the provision of any treatment, care, good, service or medication necessary to maintain the health or safety of a resident," NMSA 1978 §30-47-3(F)(3);

p.  allow residents to be "free of interference, coercion, discrimination, and reprisal from the facility in exercising his or her rights" 42 CFR §483.10(a)(2);

q.  immediately consult with the resident's physician and notify the resident's legal representative or an interested family member when there was:

    i.  "an accident involving the resident which results in injury and has the potential for requiring physician intervention," 42 CFR §483.10(b)(11)(i)(A);

    ii.  "a significant change in the resident's physical, mental, or psychosocial status," 42 CFR §483.10(b)(11)(i)(B);

14

r.      allow resident to "voice grievances without discrimination or
        reprisal. Such grievances include those with respect to treatment
        which has been furnished as well as that which has not been
        furnished; and prompt efforts by the facility to resolve grievances
        the resident may have" 42 CFR §483.10(f)(1);

s.      allow resident "to be free from verbal, sexual, physical, and mental
        abuse" 42 CFR §483.13(b);

t.      "ensure that all alleged violations involving mistreatment, neglect, or
        abuse, including injuries of unknown source....are reported
        immediately to ...officials in accordance with state law" 42 CFR
        §483:13(c)(2);

u.      "have evidence that all alleged violations are thoroughly
        investigated, and must prevent further potential abuse" 42 CFR
        §483.13(c)(3);

v.      "care for its residents in a manner and in an environment that
        promotes maintenance or enhancement of each resident's quality of
        life" 42 CFR §483.15;

w.      "promote care for residents in a manner and in an environment that
        maintains or enhances each resident's dignity and respect" 42 CFR
        §483.15 (a);

x.      "must conduct initially and periodically a comprehensive, accurate,
        standardized, reproducible assessment of each resident's functional
        capacity" 42 CFR §483.20 (a);

y.      "provide the necessary care and services to attain or maintain the
        highest practicable physical, mental, and psychosocial well-being, in
        accordance with the comprehensive assessment and plan of care" 42
        CFR §483.25

z.      ensure that "a resident's abilities in activities of daily life do not
        diminish unless circumstances of the individual's clinical condition
        demonstrate that diminution was unavoidable.    42 CFR
        §483.25(a)(1). This includes the resident's ability to:

        i.      "Bathe, dress and groom" 42 CFR §483.25(a)(1)(i);
        ii.     "Transfer and ambulate" 42 CFR §483.25(a)(1)(ii);
        iii.    "Toilet" 42 CFR §483.25(a)(1)(iii);
        iv.     "Eat" 42 CFR §483.25(a)(1)(iv); and
        v.      "Use speech, language, or other functional communication
                systems" " 42 CFR §483.25(a)(1)(v).

aa.    ensure that "a resident who is unable to carry out activities of daily living receives the necessary services to maintain good nutrition, grooming, and personal and oral hygiene" 42 CFR §483.25(a)(3);

bb.    ensure that "a resident who is incontinent of bladder receives appropriate treatment and services to prevent urinary tract infections and to restore as much normal bladder function as possible" 42 CFR §483.25(d)(2);

cc.    ensure that "a resident who enters a facility without a limited range of motion does not experience a reduction in range of motion unless that resident's clinical condition demonstrates that a reduction in range of motion is unavoidable" 42 CFR §483.25(e)(1);

dd.    ensure that "a resident with a limited range of motion receives appropriate treatment and services to increase range of motion and/or prevent further decrease in range of motion" 42 CFR §483.25(e)(2);

ee.    ensure that "a resident who displays mental or psychosocial adjustment difficulty, receives appropriate treatment and services to correct the assessed problem" 42 CFR §483.25(f)(1);

ff.    ensure that "a resident whose assessment did not reveal a mental or psychosocial adjustment difficulty does not display a pattern of decreased social interaction and/or increased withdrawn, angry, or depressive behaviors, unless the resident's clinical condition demonstrates that such a pattern was unavoidable" 42 CFR §483.25(f)(2);

gg.    ensure that "each resident receives adequate supervision and assistance devices to prevent accidents" 42 CFR §483.25(h)(2);

hh.    "ensure that a resident maintains acceptable parameters of nutritional status" 42 CFR §483.25(i)(1);

ii.    "ensure that a resident receives a therapeutic diet when there is a nutritional problem" 42 CFR §483.25(i)(2);

jj.    "provide each resident with sufficient fluid intake to maintain proper hydration and health" 42 CFR §483.25(j);

kk.    avoid administering any unnecessary drugs. An unnecessary drug is any drug when used:

      i.   In excessive dose. 42 CFR §483.25(l)(i);

     ii.   For excessive duration. 42 CFR §483.25(l)(ii);

   iii.   Without adequate monitoring. 42 CFR §483.25(l)(iii);

   iv.   Without adequate indications for its use. 42 CFR §483.25(l)(iv);

    v.   In the presence of adverse consequences which indicate the dose should be reduced or discontinued. 42 CFR §483.25(l)(v);

   vi.   Any combinations of the reasons above. 42 CFR §483.25(l) (vi).

ll.     "ensure that residents are free of any significant medication errors" 42 CFR §483.25(m)(2);

mm.    provide sufficient nursing staff to provide "nursing and related services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care" 42 CFR §483.30;

nn.    "provide each resident with a nourishing, palatable, well-balanced diet that meets the daily nutritional and special dietary needs of each resident" 42 CFR §483.35;.

oo.    "assist residents in obtaining routine and emergency dental care" 42 CFR §483.55;

pp.    "provide pharmaceutical services (including procedures that assure the accurate acquiring, receiving, dispensing, and administering of all drugs and biologicals) to meet the needs of each resident" 42 CFR §483.60;

qq.    "establish and maintain an infection control program designed to provide a safe, sanitary, and comfortable environment and to help prevent the development and transmission of disease and infection" 42 CFR §483.65;

rr.    document in a prominent part of the resident's record whether or not the resident has executed an advanced directive   42 CFR §489.102(a)(2);

ss.    comply with State laws regarding advanced directives. 42 CFR §489.102(a)(4);

tt.    provide services for residents on a continuing twenty-four (24) hour basis and shall maintain or improve physical, mental and psychosocial well-being under plan of care" 7 NMAC 9.2.2;

uv.    allow residents to "present grievances on one's own behalf or through others to the facility's staff or administrator, to public

officials or to any other person without justifiable fear of reprisal" 7 NMAC 9.2.22(C);

vv.  require all employees and providers to treat its residents with courtesy, respect and full recognition of one's dignity and individuality 7 NMAC 9.2.22(F);

ww.  allow its residents to be free from mental and physical abuse, and be free from chemical and physical restraints except as authorized in writing by a physician for a specified and limited period of time and documented in the resident's medical records. 7 NMAC 9.2.22 (L);

xx.  allow its residents to receive adequate and appropriate care within the capacity of the facility. 7 NMAC 9.2.22 (M);

yy.  "each resident shall be kept comfortably clean and well groomed" 7 NMAC 9.2.42 (A)(1);

zz.  "each resident shall have clean clothing as needed to present a neat appearance and to be free of odors" 7 NMAC 9.2.42 (A)(3);

aaa.  require its nursing personnel to "employ appropriate nursing management techniques to promote the maintenance of skin integrity and to prevent development of decubiti filed in the resident's clinical record" 7 NMAC 9.2.42 (B);

bbb.  assist residents who require assistance with food or fluid intake as necessary. 7 NMAC 9.2.42 (E)(3);

ccc.  require its nursing personnel to "provide care, including proper hydration, designated to maintain current functioning and to improve the resident's ability to carry out activities of daily living" 7 NMAC 9.2.42 (B)(2);

ddd.  notify a resident's physician and designated family member of any significant accident, injury or adverse change in resident's condition. 7 NMAC 9.2.43 (A); and

eee.  require that there was "sufficient nursing service personnel assigned to care for the specific needs of each resident on each tour of duty." 7 NMAC 9.2.51 (A);

56.  As a direct and proximate result of the DEFENDANTS' actions and omissions in violation of state and federal law and regulations, Mr. Spradlin and his statutory heirs under the Wrongful Death Act suffered the following damages: the reasonable expenses of his medical care and treatment, the reasonable expenses of his funeral and burial; the

18

monetary worth of his pain and suffering; the monetary worth of his life and the loss of the value of his life. The neglect that resulted in Mr. Spradlin's death was accompanied by aggravating circumstances for which the Plaintiff is entitled to additional damages.

57.   The statutes and regulations cited above set the minimum standards the DEFENDANTS are required to meet in providing care to patients such as Mr. Spradlin.

58.   The statutes and regulations cited above were enacted for the benefit or protection of a class of the public, of which Mr. Spradlin was a member of at all times material to this action.

59.   The DEFENDANTS violated these statutes and regulations in caring for Mr. Spradlin and other similarly situated residents at the NURSING HOME.

60.   As a proximate result of the violation of the statutes and regulations by the DEFENDANTS, which constitutes negligence per se, Mr. Spradlin suffering injuries and damages, which resulted in his death on March 11, 2009.

61.   The actions of the DEFENDANTS, through their agents or employees, were malicious, willful reckless, and/or done with wanton disregard for Mr. Spradlin. giving rise to punitive damages against the DEFENDANTS.

62.   Plaintiff's request that the jury be advised of these duties in accordance with an appropriate jury instruction.

## COUNT IV
## NEGLIGENT OR INTENTIONAL MISREPRESENTATION

63.   All allegations set forth above in paragraphs 1 through 62 are incorporated by reference as if fully set forth herein.

64.   Around the time of Mr. Spradlin's admission to the NURSING HOME and on numerous occasions thereafter, the Defendants represented to Plaintiff and to state and federal agencies that they had sufficient numbers of nurses and nurses' aides on staff at their facility to provide proper care and treatment to Mr. Spradlin and other residents at their facility.

19

65.     Around the time of Mr. Spradlin's admission to the NURSING HOME and on numerous occasions thereafter, Defendants made representations about the quality of care Mr. Spradlin would receive at their facility to Plaintiff and to state and federal agencies.

66.     The above representations were in fact false, and the Defendants knew, or should have known, that they were false at the time the representations were made.   The Defendants intended to induce Plaintiff and/or his agents and representatives to act or refrain from acting in reliance upon the representations.

67.     As a direct and proximate result of Defendant's misrepresentations, Mr. Spradlin and his family were denied the accurate information to which they were entitled and needed, to ensure that Mr. Spradlin received adequate care while at their facility.

68.     Plaintiff justifiably relied upon the representations in acting or refraining from acting and as a result sustained damages.

69.     As a direct and proximate result of Defendants' misrepresentations, Mr. Spradlin did not receive the necessary medical treatment he needed, which caused him great pain and suffering in the last months of his life.

70.     The misrepresentations of Defendants directly and proximately caused or contributed to Mr. Spradlin's death or decreased his chance of survival.

71.     As a direct and proximate result of Defendants' misrepresentations, Mr. Spradlin and his statutory heirs under the Wrongful Death Act suffered damages, which are incorporated herein by reference.

## COUNT V
## VIOLATION OF THE UNFAIR TRADE PRACTICES ACT

72.     All allegations set forth above in paragraphs 1 through 71 are incorporated by reference as if fully set forth herein.

73.     Upon information and belief, the DEFENDANTS held the NURSING HOME out to Mr. Spradlin and his family as being a facility that provided services that would meet, if not exceed, the standards of care established for nursing homes.

74.     The actions of Defendants set forth herein, constitute unfair, deceptive, or unconscionable practices prohibited by NMSA 1978 §§ 57-12-1 through 57-12-20.

75.     Defendants, through agents and employees, violated the Unfair Trade Practices Act by knowingly engaging in unfair, deceptive or unconscionable trade practices in one or more of the following ways:

    a. Making false or misleading oral or written statements or other representations in connection with the sale of its services, which tended to or did deceive or mislead Mr. Spradlin and his family, including, but not limited to:

        i. representing that their services have characteristics that they did not have, in violation of NMSA 1978, § 57-12-2(D)(5) and NMSA 1978, § 57-12-3;

        ii. representing that their services were of a particular standard, quality or grade when they were not of such standard, quality or grade, in violation of NMSA 1978, § 57-12-2(D)(7) and NMSA 1978, § 57-12-3;

        iii. failing to provide the quality of services contracted for by Mr. Spradlin and his family, in violation of NMSA 1978, § 57-12-2(D)(17) and NMSA 1978, § 57-12-3;

    b. Engaging in acts or practices in connection with the offering of services for sale, which to the detriment of Mr. Spradlin and his family;

        i. took advantage of the lack of knowledge, ability, experience or capacity of Mr. Spradlin and his family to a grossly unfair degree, in violation of NMSA 1978, § 57-12-2(E)(1) and NMSA 1978, § 57-12-3; or

        ii. resulted in a gross disparity between the value received by Mr. Spradlin and the price paid for the contracted services, in violation of NMSA 1978, § 57-12-2(E)(2) and NMSA 1978, § 57-12-3.

76.     As a direct and proximate result of the willful, unfair, deceptive, or unconscionable trade practices of Defendants, Mr. Spradlin was harmed.

77.     Defendants should reimburse all amounts paid to Defendants on behalf of Mr. Spradlin, pay an amount necessary to punish and deter Defendants from engaging in false advertising as well as attorneys' fees.

## COUNT IV
## PUNITIVE DAMAGES

78.     All allegations set forth above in paragraphs 1 through 77 are incorporated by reference as if fully set forth herein.

79.     As a direct and proximate result of the negligence and other wrongful conduct of the Defendants as set out above, Mr. Spradlin suffered injuries including, but not limited to, dehydration, malnutrition, weight loss, falls resulting in serious injuries, infections, sepsis, pain and suffering, mental anguish, humiliation, and wrongful death.

80.     The longevity, scope and severity of Defendants' failures and actions and their deliberately indifferent actions with regard to the welfare and safety of helpless residents such as Mr. Spradlin constitute gross negligence, willful, wanton, reckless, malicious, and/or intentional misconduct.

81.     Such conduct was undertaken by Defendants without regard to the health and safety consequences to those residents, such as Mr. Spradlin entrusted to their care. Moreover such conduct evidences such little regard for their duties of care, good faith, and fidelity owed to Mr. Spradlin as to raise a reasonable belief that the acts and omissions set forth above are the result of conscious indifference to Mr. Spradlin's rights and welfare.

82.     Plaintiff seeks compensatory and punitive damages in an amount to be determined by the jury, plus costs and any other relief to which Plaintiff is entitled by law.

83.     For damages to be determined by the jury, in an amount to adequately compensate Plaintiff for all the injuries and damages sustained;

84.     For all general and special damages caused by the alleged conduct of Defendants;

85.     For the costs of litigating this case;

86.     For punitive damages sufficient to punish Defendants for their egregious conduct and to deter Defendants and others from repeating such atrocities; and

85.     For all other relief to which Plaintiff is entitled under New Mexico law.

Attorneys for Plaintiff:

Mary Ellen Spiece
Wilkes & McHugh, P.A.
2355 E. Camelback Road, Suite 910
Phoenix, AZ 85016
(602) 553-4552

23

**EXHIBIT** ___/___

STATE OF NEW MEXICO
COUNTY OF LEA
FIFTH JUDICIAL DISTRICT

IN THE MATTER OF THE WRONGFUL
DEATH OF DOUGLAS SPRADLIN

No. CL-2010-111

## ORDER APPOINTING PERSONAL REPRESENTATIVE TO PURSUE WRONGFUL DEATH CLAIM IN ACCORDANCE WITH § 41-2-3 NMSA 1978

This matter comes before the Court on the Petition of Jason Spradlin, for appointment as personal representative of the wrongful death estate of Douglas A. Spradlin, Jr. The Court has reviewed the petition, and being fully advised in the premises, finds that good cause exists for granting the petition for appointment of personal representative of the wrongful death estate of Douglas A. Spradlin, Jr.

IT IS HEREBY ORDERED that the petition for appointment of personal representative for the wrongful death action is granted, and Jason Spradlin is hereby appointed as personal representative of the wrongful death estate of Douglas A. Spradlin, Jr., decedent, without bond, in an unsupervised administration.

_____
District Court Judge

Submitted by:

Suzanna R. Valdez
Valdez and White Law Firm, LLC
P.O. Box 25646
Albuquerque, N.M. 87125
(505) 345-0289 - Phone
(505) 345-2573 - Fax

STATE OF NEW MEXICO
COUNTY OF LEA
FIFTH JUDICIAL DISTRICT

IN THE MATTER OF THE WRONGFUL
DEATH OF DOUGLAS SPRADLIN

No. *C.V.-2010-111*

### ACCEPTANCE OF APPOINTMENT AS PERSONAL REPRESENTATIVE

Petitioner, Jason Spradlin, hereby accepts the appointment as personal representative of the wrongful death estate of Douglas A. Spradlin, Jr. in the above captioned cause.

Jason Spradlin

Respectfully submitted,

Valdez and White Law Firm, LLC

By: _____
Suzanna R. Valdez
P.O. Box 25646
Albuquerque, N.M. 87125
Phone: (505) 345-0289
Facsimile: (505) 345-2573

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

EN~ ~ ~ ~'D
First Judic ~ ~ ~ct Court

JUN 2 9 2011

Santa Fe, Rio Arriba &
Los Alamos Counties
PO Box 2268
Santa Fe, NM 87504-2268

JASON SPRADLIN, AS PERSONAL
REPRESENTATIVE OF THE WRONGFUL
DEATH ESTATE OF DOUGLAS A. SPRADLIN. JR.,
DECEASED,

                    Plaintiff,

vs.                                        NO. D0101-CV-2011-02107

THI OF NEW MEXICO AT HOBBS CENTER,
L.L.C., THI OF NEW MEXICO, L.L.C.,
THI OF BALTIMORE, INC., FUNDAMENTAL
LONG TERM CARE HOLDINGS, L.L.C.,
TRANS HEALTHCARE, INC.,
MURRAY FORMAN, LEONARD GRUNSTEIN,
ERIC MCLEMORE, DAVID STROUD,
AND DOES 1-250,

                    Defendants,

### JURY DEMAND

COMES NOW, Jason Spradlin, as Personal Representative for the Wrongful

Death Beneficiaries of Douglas A. Spradlin, Jr., deceased, by and through his attorneys,

Wilkes & McHugh, P.A., (Mary Ellen Spiece) and hereby demands trial by six jurors in

the above captioned matter.

                    Respectfully submitted,

                    WILKES & McHUGH. P.A.

                    Mary Ellen Spiece
                    2355 E. Camelback Road, Suite 910
                    Phoenix, AZ 85016
                    (602) 553-4552

1

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

**ENDORSED**
**First Judicial District Court**

JUN 2 9 2011

Santa Fe, Rio Arriba &
Los Alamos Counties
PO Box 2268
Santa Fe, NM 87504-2268

JASON SPRADLIN, AS PERSONAL
REPRESENTATIVE OF THE WRONGFUL
DEATH ESTATE OF DOUGLAS A. SPRADLIN, JR.,
DECEASED,

        Plaintiff,

vs.

        NO. D0101-CV-2011-02407

THI OF NEW MEXICO AT HOBBS CENTER,
L.L.C., THI OF NEW MEXICO, L.L.C.,
THI OF BALTIMORE, INC., FUNDAMENTAL
LONG TERM CARE HOLDINGS, L.L.C.,
TRANS HEALTHCARE, INC.,
MURRAY FORMAN, LEONARD GRUNSTEIN,
ERIC MCLEMORE, DAVID STROUD,
AND DOES 1-250,

        Defendants.

## CERTIFICATION REGARDING ARBITRATION
## PURSUANT TO LR2-603

      COMES NOW, Jason Spradlin, as Personal Representative for the Wrongful

Death Beneficiaries of Douglas A. Spradlin, Jr., deceased, by and through his attorneys,

Wilkes & McHugh, P.A., (Mary Ellen Spiece) and hereby certifies that the amount

sought in this action **exceeds $25,000.00**, exclusive of punitive damages, interest, costs

and attorney fees.

              Respectfully submitted,

              WILKES & McHUGH, P.A.

              Mary Ellen Spiece
              2355 E. Camelback Road, Suite 910
              Phoenix, AZ 85016
              (602) 553-4552

1

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

JASON SPRADLIN, AS PERSONAL
REPRESENTATIVE OF THE WRONGFUL
DEATH ESTATE OF DOUGLAS A. SPRADLIN. JR.,
DECEASED.

        Plaintiff,

vs.                            D-0101-CV-2011-02107

THI OF NEW MEXICO AT HOBBS CENTER,
L.L.C., THI OF NEW MEXICO, L.L.C.,
THI OF BALTIMORE, INC., FUNDAMENTAL
LONG TERM CARE HOLDINGS, L.L.C.,
TRANS HEALTHCARE, INC.,MURRAY FORMAN,
LEONARD GRUNSTEIN, ERIC MCLEMORE,
DAVID STROUD, AND DOES 1-250,

        Defendants.

## ORDER STAYING PROCEEDINGS PURSUANT TO
### NMSA 1978, § 44-7A-8(f)

THIS MATTER having come before the Court with regard to Defendants THI of New Mexico at Hobbs Center, LLC and THI of New Mexico LLC's Motion to Stay, and the Court having reviewed the matter and otherwise being advised of these premises herein FINDS AND ORDERS:

    1.    On September 6, 2011, the Moving Defendants filed a complaint and motion to compel arbitration in the United States District Court for the District of New Mexico ("Federal District Court"), pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16, seeking an order compelling Plaintiff to arbitrate claims that he has asserted against them in this action pursuant to a written arbitration agreement ("federal complaint").

    2.    Pursuant to NMSA 1978, § 44-7A-8(f), "[i]f a party makes a motion to the court to order arbitration, the court on just terms shall stay any judicial proceeding that involves a claim alleged to be subject to the arbitration until the court renders a final decision under this section

EXHIBIT
2

3.      In their complaint and motion, the Moving Defendants allege that Plaintiff's asserted causes of action against them and the other Defendants Plaintiff's asserted causes of action against Moving Defendants and the other defendants wrongful death (Count I), negligence (Count II), negligence per se (Count III), negligent or intentional misrepresentation (Count IV), violation of New Mexico's Unfair Trade Practices Act (Count V), and punitive damages (Count VI), are subject to arbitration pursuant to an arbitration provision contained in an admission contract signed by Douglas Spradlin and by one of the individuals who held a power of attorney for Mr. Spradlin, at the time Douglas Spradlin entered the nursing home facility in Hobbs, New Mexico.  In his complaint, Plaintiff alleges that all of the Defendants to this action, including the Moving Defendants, "were the knowing agents and/or alter-egos of one another, inclusive, and that the DEFENDANTS' officers, directors, and managing agents, directed, approved, and/or ratified the conduct of each of the other DEFENDANTS' officers, agents, and employee, and are therefore vicariously liable for the actions and/or omissions of their co-defendants...." (Complaint ¶ 23).

4.      Interests of economy, efficiency and the proper administration of justice further warrant the stay mandated by Section 44-7A-8(f) because Plaintiff's theories of derivative liability as to the Non-Moving Defendants create a significant danger of inconsistent rulings, piecemeal litigation, and waste of time and resources.  Because each Count of Plaintiff's Complaint treats the acts and omissions of all Defendants as a unitary tortious acts without differentiation as to any particular Defendant, there is no efficiency or economy in allowing Plaintiff to proceed against the Non-Moving Defendants until the Federal District Court decides whether the Moving Defendants' are entitled to have the claims asserted against them in an arbitral forum.

5.      Accordingly, this proceeding is stayed in its entirety until the Federal District Court resolves the Moving Defendants' motion to compel arbitration.

THE HONORABLE SARAH SINGLETON

SUBMITTED BY:

<u>Electronically signed by:</u>
Lori D. Proctor
JOHNSON TRENT WEST & TAYLOR, LLP
919 Milam Street, Suite 1700
Houston, TX 77002

**EXHIBIT** _D_

# WILKES & McHUGH, P.A.
## ATTORNEYS AT LAW

2355 EAST CAMELBACK ROAD
SUITE 910
PHOENIX, ARIZONA 85016

PHONE: (602) 553-4552
TOLL FREE: (866) 553-4552
FAX: (602) 553-4557

September 17, 2014

Lori D. Proctor, Esq.
Cooper & Scully, P.C.
Bank of America Center
700 Louisiana Street, Suite 3850
Houston, TX 77002

Faith Kalman Reyes, Esq.
The Simons Firm, LLP
P.O. Box 5333
Santa Fe, NM 87502-5333

Re:   ***Spradlin, Douglas v. Hobbs Healthcare Center***

Dear Counsel,

Given that there are three separate Spradlin cases stemming from the same facts and injuries, I propose we consolidate the three cases and schedule a single arbitration. Please let me know by September 23, 2014, if you will agree to consolidate the cases and arbitrate Plaintiff's claims against all Defendants.

Thank you.

Sincerely,

Mary Ellen Spiece

MES/rr

**EXHIBIT E**

**Renee Richey**

| | |
|---|---|
| **From:** | Faith Reyes <FReyes@simonsfirm.com> |
| **Sent:** | Tuesday, September 23, 2014 6:19 AM |
| **To:** | Mary Ellen Spiece |
| **Cc:** | lproctor@proctor-law.com; Georgianna Gonzales; Samantha Garcia; Renee Richey |
| **Subject:** | RE: Spradlin |

Mary Ellen – I am travelling but wanted to get back to you on this letter.  I do not believe a single arbitration is appropriate as my clients are not subject to the arbitration provisions, nor do I believe that you need them as defendants in order to proceed.  I suggest that you proceed to arbitration with the facility and stay the action as to my non-Facility defendants unless and until there is both a) an arbitration award in favor of the Plaintiff pending an arbitration award in favor of the Plaintiff  AND b) the Plaintiff is unable to collect on any such award from the Facility. In other words, the claims against my clients only become necessary if the Plaintiff is unable to collect an award from the Facility.  Faith

--- Original Message ---
From: Renee Richey
Received: 09/17/2014 04:45 PM
To: lproctor@proctor-law.com, FReyes@simonsfirm.com
Cc: Mspiece@wilkesmchugh.com
Subject: Spradlin

Good afternoon,

Please see the attached correspondence from Mary Ellen.

Thank you,

Renee

*******************************************************
Wilkes & McHugh, P.A. is a full-service civil litigation law
firm handling a wide variety of claims from coast to coast. Our
lawyers have extensive experience handling: medical malpractice,
wrongful death, serious auto and truck accidents, product
liability, toxic torts, premises liability, corporate fraud and
misconduct, as well as other types of serious injury cases
including nursing home abuse or neglect.

This e-mail message and any attachments are confidential and may
be privileged. If you are not the intended recipient, please
notify this firm immediately by replying to this message and
destroy all copies of this message and any attachments.

*************************************************************